MAGALI SELOSSE, demandante y recurrida, *v.* FUNDACIÓN EDUCATIVA ANA G. MÉNDEZ, ETC., demandados y recurrentes.

*Número:* RE-85-610 *Resuelto:* 31 de octubre de 1988

*A.J. Amadeo Murga,* abogado de los recurrentes; *José Luis Cabán Ramírez,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La Prof. Magali Selosse Ramírez presentó acción en el Tribunal Superior, Sala de Caguas, contra el Colegio Universitario del Turabo (C.U.T.). Alegó que negligente, discriminatoriamente y de mala fe fue privada —a diferencia de otros profesores— de la oportunidad y derecho a proseguir estudios adicionales y que se le negó injustificada e ilegalmente la permanencia. Adujo y solicitó indemnización por concepto de lucro cesante y "graves daños por incumplimiento de contrato así como angustias mentales, morales, espirituales y profesionales . . .". Apéndice, pág. 2. C.U.T. negó responsabilidad.

Luego de desfilada abundante prueba testifical y documental, el tribunal declaró con lugar la demanda. Ordenó su reposición al cargo de profesora con carácter permanente y el pago de los sueldos dejados de percibir desde agosto de 1980, lo que incluye cualquier aumento concedido durante ese período más vacaciones, bono y demás beneficios. Reconoció la suma de $50,000 por los sufrimientos y las angustias mentales, *e igual cantidad como penalidad,* intereses legales y la cuantía de $6,000 de honorarios de abogado. Finalmente dispuso el cese de toda discriminación.

Inconforme, a solicitud del C.U.T. revisamos. Argumenta, en síntesis, que dicho dictamen fue arbitrario y no representa el balance más justiciero de la totalidad de la prueba. Impugna por excesivas e improcedentes las indemnizaciones, los intereses y los honorarios.

## I

Las alegaciones en torno a la evaluación de la prueba ha exigido una cuidadosa lectura de la transcripción de evidencia. En lo fundamental, las determinaciones de hecho del foro de instancia encuentran apoyo en la prueba. Imprescindible, pues, una referencia sinóptica al trasfondo fáctico producto de ese examen.

La Prof. Magali Selosse Ramírez —dotada de una maestría en educación y concentración en Tecnología Educativa— brindó servicios en el C.U.T. por seis (6) años consecutivos, correspondientes a los términos académicos que comenzaron en agosto de 1974 y finalizaron en dicho mes de 1980. Se desempeñó como profesora en el Departamento de Educación debidamente cualificada. Al presente posee otra maestría en Educación Elemental.

La institución universitaria C.U.T. exige seis (6) años de servicio probatorio antes de conceder la permanencia a un profesor. A su vez, el contrato de permanencia académica conlleva la renovación automática del nombramiento por un período de diez (10) años. Para ser acreedor a la permanencia, la reglamentación requiere varios pasos. Primero, el candidato debe ser recomendado por el Comité de Permanencia, designado y compuesto por el Rector del recinto —quien lo preside— un representante de la administración, un profesor en representación de toda la facultad, un profesor de cada instituto que tenga profesores a evaluarse y un estudiante en representación del cuerpo estudiantil. En aquellos casos en que haya tres (3) o menos institutos representados, el Rector nombrará dos (2) profesores adicionales en representación de cualesquiera dos (2) institutos. *Estatutos y Reglamentos de Facultad*, San Juan, Fundación Educativa Ana G. Méndez, Inc., 1983, Parte V, Sec. 4. Las evaluaciones se presentan ante el Comité de Permanencia a base de ésos cuatro (4) componentes, a saber: estudiantes, facultad, director del instituto y decano académico. El profesor con-

cernido debe ser valorado en todos con una mediana (MD) mínima de cuatro (4) a un máximo de cinco (5). Esta recomendación va al Consejo Administrativo, integrado nuevamente por el Rector, el decano académico, los decanos de administración, de estudiantes, de recursos de aprendizaje y de extensión y educación continuada, conjuntamente con dos (2) representantes de la facultad electos y un representante del estudiantado designado por el Consejo de Estudiantes. Art. III, Sec. 1 de los Estatutos para el C.U.T. El Consejo Administrativo decide luego de analizar los resultados de las evaluaciones y necesidades institucionales fundamentales.(1)

---

(1) El Art. VI, Secs. 1 y 2 de los *Estatutos y Reglamento de Facultad*, San Juan, Fundación Educativa Ana G. Méndez, Inc., 1983, así lo establece:

"ARTICULO VI—PERIODO PROBATORIO Y PERMANENCIA

"SECCION 1—*Periodo Probatorio*

"Todo miembro de la Facultad regular servirá por un periodo probatorio máximo de dos (2) años académicos. No más tarde del segundo semestre de su segundo año será evaluado según establecido por el Manual de Normas y Procedimientos para la Evaluación de Facultad para Dos Años y Permanencia.

"Si el profesor no aprobare dicha evaluación la Fundación dará por terminado sus servicios.

"El Rector informará al evaluado el resultado del proceso de evaluación con no menos de sesenta (60) días de anticipación al vencimiento de su contrato y/[o] nombramiento.

"SECCION 2—*Permanencia*

"La permanencia académica es un privilegio institucional que otorga la Fundación, previa recomendación del Consejo Administrativo, a personas dedicadas todo el tiempo a tareas docentes en la institución.

"Los miembros de la facultad podrán obtener la permanencia al iniciarse el séptimo año de servicios a la institución.

"La permanencia conlleva la renovación automática de su nombramiento por un período de diez (10) años. Cada diez (10) años se reevaluará por el Consejo Administrativo la condición de permanencia de los miembros de la facultad hasta su edad de retiro obligatorio.

"A partir del año académico 1983–84 en el PRJC todo profesor que ingrese como profesor regular y logre su permanencia, al cabo de 10 años de haberla obtenido será reevaluada la misma por el Consejo Administrativo.

"Inciso 1.

"Cada miembro de la Facultad será evaluado para permanencia durante el segundo semestre de su sexto año de servicio ininterrumpido a la Institución según establecido por el Manual de Normas y Procedimientos para la Evaluación de Facultad para Dos Años y Permanencia.

La evaluación realizada por el Comité de Permanencia es de naturaleza acumulativa. Recopila y toma en consideración cualquier evaluación anterior, incluso la realizada durante el período probatorio. Al respecto, todo miembro de facultad regular sirve un período probatorio máximo de dos (2) años. Anterior al segundo semestre de su segundo año, se le efectúa una evaluación que de no aprobar conlleva dar por terminados sus servicios. De ser aprobados, se les podrá extender nombramientos anuales de acuerdo con las necesidades de la institución, y de ser recomendados por el director del instituto y el decano académico, hasta el sexto año. En el segundo semestre del mencionado año se evalúa el miembro del claustro por el Comité de Permanencia antes referido. El Rector finalmente presenta las recomendaciones ante el Consejo Administrativo.

Durante los primeros cuatro (4) años de su labor docente, Selosse Ramírez estuvo bajo la supervisión del Prof. Wenceslao Laureano, entonces Director del Instituto de Educación. Las evaluaciones anuales de éste, en general, la encomiaban. T.E. I, pág. 637. Elogió también su integridad profesional. A modo de ejemplo, relató un suceso en el cual la profesora Selosse Ramírez se vio involucrada durante su incumbencia como director. El incidente fue motivado por la negativa de Selosse Ramírez a cambiar las calificaciones de una estudiante, esposa de un miembro de la facultad, que estaba fracasada en su clase. Dicho miembro de la facultad realizó un acercamiento con el fin de que se alterase la calificación y así poder su esposa obtener la licencia de maestra a que aspiraba. Selosse Ramírez rechazó la idea y, por consiguiente, la

---

"Su evaluación será considerada por un Comité de Permanencia designado y presidido por el Rector. El Rector a su vez presentará las recomendaciones de éste ante el Consejo Administrativo. El Comité de Permanencia estará compuesto por administradores, facultad permanente y estudiantes. En aquellos casos en que no haya facultad permanente en el área el Rector nombrará un profesor entre los de más antig[ü]edad y preparación." Apéndice, págs. 50–51.

esposa de ese profesor se dio de baja de la clase. Como resultado del incidente, éste jamás le volvió a dirigir la palabra. *Cabe señalar el hecho de que este miembro del claustro posteriormente formó parte del Comité de Permanencia que evaluó a Selosse Ramírez.* T.E. I, págs. 120, 421, 427, 478 y 479.

En el 1978, Laureano fue sustituido como director por el Prof. Jesús Joel Pérez. En su evaluación general, éste también mencionó que ella realizaba "un trabajo satisfactorio en el Departamento". Apéndice, pág. 65. Sin embargo, recomendó que continuara estudios en otra área de concentración, por cuanto los cursos relacionados con su preparación académica eran cada vez más limitados en el departamento por razón de disminuir en demanda. Manifestó también que, aunque la profesora Selosse Ramírez se involucraba en discusiones que ayudaban a mejorar la calidad de los cursos, su participación era un tanto agresiva y desconfiada. Recomendó, además, que la profesora mejorara la forma y tono en que criticaba los servicios a los estudiantes.

Insatisfecha con esa apreciación, ella le comunicó su opinión de que el documento de evaluación estaba prejuiciosamente redactado, lo cual "atribuy[ó] a la falta de experiencia y objetividad de su parte como evaluador y director".[2] Apéndice, pág. 72. El 1ro de noviembre de 1978, Jesús Joel Pérez —quien ocuparía posteriormente la posición de decano académico y, como tal, conjuntamente con el director del instituto, haría una de las recomendaciones de mayor peso ante el Comité de Permanencia— le respondió que lamentaba que ella no estuviera dispuesta a seguir sus "recomendaciones

---

[2] El acontecimiento que generó la crítica, según Selosse Ramírez, fue que Jesús Joel Pérez le sugirió que expulsara a unos estudiantes para resolver un problema. Ella no estuvo de acuerdo y le manifestó que "esa no era la forma de resolver un problema institucional, que a él le faltaba experiencia administrativa para resolver los problemas del instituto". T.E. I, pág. 354. Entendió que esto molestó a Jesús Joel Pérez y motivó la carta.

para su mejoramiento personal y profesional en beneficio de la Institución. Esta oficina le dará a dicho documento la atención pertinente". Íd., pág. 73.

Subsiguientemente, la Prof. María Josefa Rechani sustituyó a Jesús Joel Pérez y advino como Directora del Instituto de Educación para el año académico 1979–1980. Las relaciones personales entre Selosse Ramírez y Rechani no fueron cordiales y, por ende, afectaron las profesionales. La propia directora Rechani las describió como "tens[as]". T.E. II, pág. 574. Selosse Ramírez desconfiaba de la profesora Rechani. Este ambiente suscitó varios incidentes durante el proceso de evaluación a que fue sometida. Entre estos cabe mencionar una acalorada discusión durante la evaluación realizada por el estudiantado durante el 1er semestre del año académico 1979–1980. La directora Rechani se personó a administrar el instrumento de medición a los estudiantes de Selosse Ramírez, a lo cual ésta vehementemente se opuso. Exigió que fuera el Prof. Wenceslao Laureano quien administrara y custodiara los documentos evaluativos, pues temía que éstos fuesen alterados. T.E. II, pág. 573.

Aun así la directora Rechani, al igual que los dos (2) anteriores predecesores, recomendó a Selosse Ramírez que continuase estudios en un área de necesidad institucional. Notamos que las únicas deficiencias detectadas sólo sugerían que mejorara sus relaciones con los demás miembros de la facultad y continuara estudios en áreas de necesidad institucional. Eventualmente la profesora Selosse Ramírez se matriculó en varios cursos de pedagogía en la Universidad de Puerto Rico. Subsiguientemente tuvo que darse de baja por no haber logrado que la directora, profesora Rechani, le restructurara un programa de clases no conflictivo con sus estudios. T.E. II, pág. 715. Después, por segunda ocasión, pidió fondos para realizar dichos estudios en el primer semestre del año académico de 1979. Esta solicitud fue negada por

falta de fondos, según notificación de la profesora Rechani. T.E. II, págs. 226, 701 y 702.

Sin embargo, posteriormente le fueron concedidos los fondos para el segundo semestre del año académico 1979 y comenzó estudios a nivel de maestría en un área de necesidad del C.U.T. en la Universidad Interamericana de Puerto Rico. La carta de recomendación dirigida a la mencionada institución, suscrita por la profesora Rechani el 2 de octubre de 1979, en lo pertinente, considera "que por sus cualidades y dominio de las materias que enseña la acreditan como una buena candidata para cursar estudios post-graduados. Además, cabe señalar que la señora Selosse, es una persona íntegra, responsable y muy capacitada para cumplir con los requisitos que exige su programa". Apéndice, pág. 138.

Esta recomendación fue hecha escasamente varios meses antes de que la profesora Rechani declarara ante el Comité de Permanencia. Refleja los atributos de la profesora Selosse Ramírez como profesional de excelencia. Igual conclusión aflora de su expediente en el C.U.T., expositivo de que ella aprobó todas las evaluaciones. Las *medianas* de las evaluaciones hechas por los estudiantes, la facultad y los anteriores directores del instituto le otorgaron la calificación *más alta de cinco (5) puntos.* Por su parte, la profesora Rechani también la aprobó, aunque la calificó con la mediana mínima de cuatro (4) puntos, que resulta ser la apreciación más baja de los cuatro (4) componentes. Según testimonio judicial de varios miembros del Comité de Permanencia, no obstante la directora Rechani haberla aprobado en su evaluación, subsiguientemente no la recomendó verbalmente ante dicho comité. T.E. II, pág. 235. Esa postura influenció y perjudicó a la profesora Selosse Ramírez ante el comité. Íd. pág. 315.

El incidente ante el tribunal es muy ilustrativo. En el contrainterrogatorio, la directora Rechani negó categóricamente haber hecho recomendación negativa en cuanto a la permanencia. Sobre el particular atestó que el comité le pre-

guntó algo distinto, a saber, que "si de acuerdo a la preparación que tenía la profesora Selosse, [Rechani] podía prepararle un programa completo", a lo cual contestó: "[H]onestamente, tuve que decir que no." T.E. II, pág. 605. Es de rigor señalar que nunca se le ha concedido la permanencia a un profesor contra la recomendación del director del instituto concernido o la del decano académico, lo cual es indicativo del gran peso que otorga dicho comité a estos endosos. T.E. I, pág. 538; T.E. II, pág. 389.

Por otro lado, la transcripción de evidencia refleja la existencia de una animosidad de la profesora Rechani contra Selosse Ramírez. T.E. I, págs. 641 y 643. Wenceslao Laureano, ex director, describió la actitud de la profesora Rechani como una "obsesión". Atestiguó que sus expresiones sobre Selosse nunca fueron positivas. Íd., pág. 490. Éste atribuyó la existencia del prejuicio a motivos personales. Íd., pág. 643. De hecho, conforme a su testimonio, en varias ocasiones la directora Rechani intentó manipularlo —además de a otros miembros del comité evaluador— para que discriminaran contra Selosse Ramírez. Íd., pág. 633. El tribunal de instancia así lo concluyó. Aparentemente se trataba de una pugna —de origen extramuros— relacionada con el historial familiar de ambas. Laureano no pudo precisar con exactitud en qué consistía. Sin embargo, añadió que éstas habían sido vecinas. En efecto, según el propio testimonio de la directora Rechani, las fincas de sus respectivas familias colindaban. Íd., pág. 642; T.E. II, pág. 676.

Ciertamente la prueba revela la existencia de un prejuicio por parte de la directora Rechani contra la profesora Selosse Ramírez. En el seno del Comité de Permanencia se discutió el asunto. T.E. II, pág. 237. Algunos miembros estaban convencidos de la existencia de esa animosidad. Íd., pág. 238. Aun así, desafortunadamente dicho comité denegó su permanencia no empece a que, en general, las evaluaciones de sus superiores desde 1973 a 1979 fueron *positivas*. Coincidimos

con el foro de instancia en que en sus testimonios los miembros del Comité de Permanencia que evaluaron a Selosse Ramírez intentaron justificar su determinación negativa a base de generalidades vagas y de poca relevancia. Al ser confrontados con su expediente, no pudieron señalar deficiencias reales o sustanciales. La única razón meritoria aducida para justificar la determinación desfavorable la constituyó su falta de preparación académica en un área de necesidad institucional.

En cuanto a este aspecto, es menester resaltar varios extremos. Primero, el C.U.T. estaba obligado a ofrecer al menos un curso de tecnología educativa según lo exige el Consejo de Educación Superior.(3) Por otro lado, el *Middle State Association* requiere que todo profesor posea, como mínimo, el grado de maestría en el área en que se especializa. La *única* con capacidad para ofrecer ese curso era la profesora Selosse Ramírez, quien para mayo de 1980 poseía una maestría en tecnología educativa. T.E. I, págs. 499 y 511; T.E. II, págs. 497, 500 y 506. Segundo, aun después de negársele la permanencia, el C.U.T. continuó ofreciendo el curso de tecnología educativa. T.E. I, págs. 191–192. Y tercero, aunque si bien al momento de realizarse su evaluación la profesora Selosse Ramírez carecía de una maestría en otra área de necesidad institucional, ya cursaba nueve (9) créditos conducentes a tal maestría. Para agosto de 1980 aprobó veintiún (21) créditos. T.E. I, págs. 75–76 y 81. A principios del año siguiente al que fue evaluada completó esa maestría adicional. Desde el punto de vista cronológico y de necesidad institucional, notamos que a los demás profesores les hubiese tomado casi el doble de tiempo, ya que la mayoría no cursaba créditos conducentes a remediar sus respectivas deficiencias

---

(3) El Consejo de Educación Superior no le concede licencia a ningún candidato a profesor que no tenga aprobado un curso por lo menos de tecnología educativa. T.E. II, págs. 497–498.

académicas. Esta realidad pone en entredicho la acción tomada por el C.U.T. Es inexplicable aceptar que en igualdad de condiciones una institución prefiera profesores que demorarían más en remediar sus deficiencias, máxime si recordamos que parte de los estudios de la profesora Selosse Ramírez fueron satisfechos por la institución. Se desconoce otro caso en las mismas circunstancias al cual se le haya denegado tiempo adicional para completar los estudios. *A contrario sensu*, la prueba refleja que la práctica prevaleciente era dar oportunidad a los miembros de la facultad para iniciar o completar dicha educación antes de proceder a una determinación final en cuanto a la permanencia. T.E. I, pág. 43. Cuatro (4) profesores —con inferior o igual evaluación a la de Selosse Ramírez— se beneficiaron de esa política institucional y se les extendió por términos de dos (2) a tres (3) años para subsanar sus deficiencias. T.E. I, pág. 442. En el contexto fáctico del caso, no existe fundamento racional o en el récord para justificar esa desigualdad en el trato.

En resumen, sobre los extremos expuestos, la prueba sostiene las determinaciones de hecho básicas del tribunal de instancia. Las mismas merecen deferencia, salvo error manifiesto, pasión, prejuicio o parcialidad. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172–181 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984).

## II

El recurrente C.U.T. enfatiza que es una institución universitaria privada. Sostiene que ello precluye que enfoquemos el asunto desde el punto de vista del debido proceso constitucional. Argumenta que no existe aquí acción del Estado (*state action*).

Es correcto que la intervención de los tribunales usualmente se da para garantizar el debido procedimiento de

ley en atención a los intereses de propiedad que, regularmente, se configuran con relación a la permanencia de un profesor en una institución educativa del Estado. *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987); *Perry v. Sinderman*, 408 U.S. 593 (1972); *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Shelton v. Tucker*, 364 U.S. 479 (1960).

◼ Ahora bien, esa trayectoria jurisprudencial no significa un vacío total del derecho a ser oído en las universidades privadas. Por alumbramiento contractual, también en esos recintos educativos pueden desarrollarse esas garantías. R. Brown, *Tenure Rights in Contractual and Constitutional Context*, 6 J.L. & Educ. 279 (1977); C. Byse, *Academic Freedom, Tenure and the Law: A Comment on Worzella v. Board of Regents*, 73 Harv. L. Rev. 304 (1959); E. Perkins, *Developments in the Law: Academic Freedom*, 81 Harv. L. Rev. 1045 (1968); Nota, *Construction and Effect of Tenure Provisions of Contract or Statute Governing Employment of College or University Faculty Member*, 66 A.L.R.3d 1018 (1975). Ahora bien, aquellos derechos derivados de un contrato requieren un trato distinto. El alcance de la revisión judicial difiere correlativamente en atención a su génesis. *McConnell v. Howard University*, 818 F.2d 58 (D.C. Cir. 1987).

◼ La cuestión es más compleja en situaciones en que las controversias rebasan la pericia judicial. La permanencia en instituciones educativas a nivel superior es una de esas instancias. Al confrontarlas —sin abdicar nuestra función— ejercitamos la revisión prudencialmente. Este enfoque responde al reconocimiento de que estas instituciones educativas realizan una importante misión social y deben estar libres de presiones e intromisiones ajenas. Además, el trato deferencial es atribuible a que en el mundo peculiar académico existe mejor experiencia y conocimiento especializado en el uso de las técnicas y evaluación por parte del pro-

fesorado. Así evitamos que los tribunales se transformen en *Super Juntas de Permanencia (super tenure committees)* sin el peritaje necesario. *García Cabán v. U.P.R.*, supra; *Lieberman v. Gant*, 630 F.2d 60 (2do Cir. 1980); *Clark v. Whiting*, 607 F.2d 634 (4to Cir. 1979); *Johnson v. University of Pittsburgh*, 435 F. Supp. 1328 (W.D. Penn. 1977); *Faro v. New York University*, 502 F.2d 1229 (2do Cir. 1974); E. Bartholet, *Application of Title VII to Jobs in High Places*, 95 (Núm. 5) Harv. L. Rev. 947 (1982); Comentario, *Balancing Academic Freedom and Civil Rights: Toward an Appropriate Privilege for the Votes of Academic Peer Review Committees*, 68 Iowa L. Rev. 585 (1983); Nota, *Title VII on Campus: Judicial Review of University Employment Decisions*, 82 Colum. L. Rev. 1206 (1982); Anotación, *Application to Tenured Positions in Educational Institutions of Provisions of Civil Rights Act of 1964, as Amended (42 USCS secs. 2000e et seq.) Prohibiting Discrimination on Basis of Sex*, 55 A.L.R. Fed. 842 (1981).

 Recientemente, en *Latimore v. University of N.C. at Charlotte*, 669 F. Supp. 1345, 1352 (1987), se resumió de manera precisa el fundamento de esta postura:

La competencia y cualificaciones de un profesor evaluado para permanencia o ascenso son, por propia naturaleza, asuntos que requieren *determinaciones altamente subjetivas; determinaciones que no se prestan a cualificaciones precisas y que no son susceptibles de medirse mecánicamente mediante el uso de exámenes estandarizados.* Estas determinaciones son en un área en la cual los funcionarios de las escuelas deben tener libertad para ejercer su juicio; especialmente cuando éstas presentan interrogantes singulares a ser juzgadas por aquellos con pericia en el área académica especializada, capacitados para las evaluaciones profesionales en torno a cualidades evasivas e intangibles, sobre el talento esperado del escolástico y maestro. Los tribunales no están cualificados para revisar y sustituir con su criterio los criterios subjetivos y discrecionales de expertos profesionales en cuanto a ascensos

de la facultad, o de manera separada ocuparse, aunque sea inteligente e informalmente, de comparar las aportaciones educativas o talento pedagógico de un miembro de facultad al cual se le denegó el ascenso por quienes se les concedió; en resumen, los tribunales no pueden ocuparse en segundas adivinanzas (*second guessing*) con relación a los ascensos de facultad por las autoridades universitarias. (Énfasis y traducción nuestras.)

Ahora bien, al igual que en la jurisdicción federal, este trato cauteloso y prudente no es óbice para el escrutinio judicial. *García Cabán v. U.P.R.*, supra; *Consejo Educación Superior v. U.I.A.*, 120 D.P.R. 224 (1987). Particularmente, con mayor razón, en situaciones que versan sobre la interpretación de un contrato. El mero hecho de que una institución universitaria esté involucrada en una disputa contractual no es suficiente para activar la norma de abstención judicial, pues implicaría, para todos los efectos prácticos, favorecer a priori una de las partes contratantes. Ello conllevaría convertir las universidades privadas en zonas de dominio absoluto con potestad exclusiva de interpretación de contratos. Ese enfoque no es permisible. *McConnell v. Howard University*, supra, págs. 67–69. La revisión del contrato, como cualquier otro, debe hacerse sin favorecer a la universidad. *MacConnell v. Howard University*, pág. 67; *Krotoff v. Goucher College*, 585 F.2d 675, 681–682 (4to Cir. 1978).

## III

En armonía con este lineamiento doctrinal, en el contexto fáctico de autos es evidente que los estatutos y reglamentos referentes a los derechos y obligaciones de los miembros de la facultad son parte del contrato entre el C.U.T. y Selosse Ramírez. El contrato anual de facultad así

lo incorpora.(4) Por su parte, el Art. 1044 del Código Civil dispone que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". 31 L.P.R.A. sec. 2994. Los tribunales están facultados para velar por su cumplimiento. *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 351 (1984); *López de Victoria v. Rodríguez*, 113 D.P.R. 265 (1982); *Olazábal v. U.S. Fidelity, etc.*, 103 D.P.R. 448 (1975); *Matricardi v. Peñagarícano, Admor.*, 94 D.P.R. 1, 4 (1967).

■ Con igual efecto jurídico, el reglamento de facultad —*Estatutos y Reglamentos de Facultad, op. cit.*, Parte V, Sec. 6— preceptúa que ante el Comité de Permanencia se "citará al profesor a una vista antes de tomar una determinación final". Apéndice, pág. 60. La Sec. 5(a)(8) de esa misma parte establece que:

Los profesores bajo evaluación para permanencia, tendrán derecho a someter por escrito al Comité de Permanencia la evidencia que tuvieren para informar a los miembros del mismo, sobre los siguientes aspectos:
a. Logros y galardones académicos e intelectuales.
b. Participación en actividades de la comunidad.
c. Obras literarias o de otra índole.
d. Investigaciones científicas, académicas, sociales, institucionales, etc.
e. *Otros aspectos relevantes que no estén incluidos en su expediente.* (Énfasis suplido.) Apéndice, págs. 59–60.

Más adelante, en lo pertinente, el mismo reglamento añade en su Sec. 5(b):

---

(4) En su inciso (G), que dispone:
"En sus funciones de enseñanza y académicas en general el profesor cumplirá los requisitos y especificaciones propias de la institución y los derivados de normas y reglamentos aplicables al sistema universitario. El profesor reconoce que ha recibido, leído y comprendido los Estatutos, el Catálogo, el Manual de Facultad y las otras Reglas y Reglamentos de la Institución y se compromete a cumplimentar, so pena de revocación de este contrato."

b. El Comité de Permanencia informará a la comunidad universitaria sobre este derecho y *le concederá tiempo razonable para someter por escrito dicha información.* (Énfasis suplido.) Apéndice, pág. 60.

Selosse Ramírez solicitó por escrito una cita con el Rector Juan M. González Lamela. Éste accedió mediante carta fechada el 16 de mayo de 1980. La misma llegó a las manos de la profesora Selosse Ramírez el 18 de mayo en horas de la tarde y le notificaba que la cita se realizaría el 19 de mayo a las 8:00 A.M. En otras palabras, la cita fue programada para temprano al día siguiente de haber recibido la notificación. Del récord se desprende claramente que la carta del Rector le aclaraba que dicha reunión sería ante el Comité de Permanencia, con lo que se cumplía así, supuestamente, con el derecho a una vista previa a la determinación final que por reglamento tenía Selosse Ramírez.

Aun partiendo de la premisa más favorable al C.U.T., a saber, que la profesora Selosse Ramírez sí tuvo conocimiento previo de que su comparecencia era ante el Comité de Permanencia, no se cumplió estrictamente con el reglamento de la institución. El escaso margen de tiempo transcurrido entre la notificación y el requerimiento de presencia nos impide resolver lo contrario. El propio reglamento concede "tiempo razonable para someter por escrito" los documentos que puedan favorecerle ante la evaluación del comité. Aquí ella tuvo menos de veinticuatro (24) horas. Tan corto lapso de tiempo dentro de las circunstancias descritas no constituye el tiempo razonable garantizado reglamentariamente.

No empece a esto, la profesora Selosse Ramírez compareció a la vista. Allí el Rector González Lamela se limitó única y exclusivamente a preguntarle si tenía algo que alegar en cuanto a sus puntos débiles. Ella de inmediato inquirió sobre cuáles eran sus deficiencias. También pidió acceso a su expediente. T.E. I, págs. 301–314. Ambas peticiones fueron

denegadas y el Rector dio por terminada la vista.(5) La vista fue pro forma. Por tal razón no tuvo la oportunidad de defender sus deficiencias ante el comité. El Comité de Permanencia, consciente de esta situación, pudo muy bien haber señalado para nueva vista el caso o al menos permitir que se examinase el expediente. Al negarse a estas alternativas violentó el acuerdo contractual.

Como último recurso, Selosse Ramírez compareció el 29 de mayo de 1980 ante el Consejo Administrativo para apelar la decisión del Comité de Permanencia. En la vista, según surge de la minuta del consejo, advino en conocimiento de los criterios que utilizó el Comité de Permanencia para rechazarla. Las deficiencias señaladas por la directora del instituto, profesora Rechani, y dicho comité de evaluación, según le fue informado allí por el Rector, resultaron ser que "su preparación no [era] en un área de necesidad del Instituto" y que "no pose[ía] las cualidades y méritos de un buen profesor universitario . . .". Apéndice, pág. 122. Inmediatamente la pedagoga refutó las anteriores deficiencias. Explicó su preparación académica y experiencia, y solicitó que se le permitiera terminar sus estudios. No tuvo éxito. El 30 de mayo de 1980 el Rector le notificó por carta la decisión final del Consejo Administrativo que ratificaba la determinación del Comité de Permanencia.

*Ex facie*, la cronología procesal antes descrita aparenta cumplir con las exigencias establecidas en el reglamento. Aunque Selosse Ramírez tuvo oportunidad de impugnar sus deficiencias ante el Consejo Administrativo, su destino estaba sellado. De la prueba documental y del propio reglamento se desprende que la etapa valorativa cardinal es la realizada por el Comité de Permanencia. Allí es donde las recomendaciones de vital importancia se originan, a saber, la

---

(5) Determinación de Hecho Núm. 12 del juez sentenciador. Apéndice, pág. 42.

del decano académico y la de la directora del instituto. Sabemos que el Comité de Permanencia aceptó y le dio gran peso a la recomendación verbal prejuiciada de la directora del instituto, profesora Rechani. Se infiere de la prueba que, fundamentado primordialmente en dicha recomendación, el comité concluyó que Selosse Ramírez carecía de cualidades suficientes para ser merecedora de la permanencia. Las probabilidades de que la profesora Selosse Ramírez lograra que. el Consejo Administrativo revocara al comité eran ínfimas. En estas circunstancias, resolvemos que el C.U.T. violentó el espíritu que inspira todo el procedimiento contractual. Procede una nueva evaluación *objetiva* que cumpla con los procedimientos establecidos en el reglamento. Esa evaluación, debidamente fundamentada, le será notificada por escrito.

## IV

Réstanos considerar los remedios procedentes y la adjudicación de daños. El tribunal sentenciador, sin análisis ni explicación detallada, aplicó la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. secs. 146–151, y la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 2000e *et seq.*, que prohíben el discrimen por razón de sexo. Aparentemente estimó que hubo ese tipo de discrimen, aunque no hizo pronunciamiento expreso al efecto. También mencionó los Arts. 1476, 1802 y 1803 del Código Civil, 31 L.P.R.A. secs. 4114, 5141 y 5142, y el Art. II, Secs. 1, 7, 8 y 16 de nuestra Constitución, L.P.R.A., Tomo 1. Bajo ese conglomerado, ordenó la reposición de la profesora Selosse Ramírez y el pago retroactivo de todos los emolumentos dejados de recibir, $50,000 por angustias mentales, igual cantidad como penalidad, intereses, más $6,000 de honorarios de abogado.

Ante nos, el C.U.T. cuestiona la responsabilidad de todas estas cuantías y argumenta, con especial énfasis, que debieron deducirse —bajo la norma de mitigación de da-

ños— los ingresos recibidos de otras fuentes de trabajo y que no procedía la penalidad. En lo fundamental tiene razón. *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485, 506 (1985); *Fresh-O-Baking Co. v. Molinos de P.R.*, 103 D.P.R. 509, 520 (1975).

De la partida correspondiente a sus emolumentos —cuya suma en esta etapa desconocemos— debe descontarse aquellos ingresos provenientes de servicios prestados a otras instituciones educativas. Al respecto, la prueba desfilada revela que la misma asciende a la suma de $20,480.[6]

 Por exagerada, también debe modificarse la suma de $50,000 por concepto de angustias mentales y reducirse a $25,000. *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757 (1978); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975); *Valldejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917 (1971). Finalmente, procede eliminar totalmente la partida de $50,000 impuesta como *penalidad*. No existe prueba para sostener discrimen por razón de sexo. Las restantes partidas —intereses y honorarios— no ameritan modificación.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López no intervino.

---

[6] Según la prueba desfilada, se desempeñó en la Escuela de Artes Plásticas de San Juan y con el Departamento de Instrucción Pública durante el período comprendido entre 1ro de septiembre de 1981 hasta mayo de 1984. Multiplicados los meses correspondientes a los distintos salarios, los mismos arrojan como subtotales $9,500, $6,300 y $4,680, para un gran total de $20,480.