# 2001 DTA 128

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL III DE ARECIBO/UTUADO**

ARNALDO BRAVO NUÑEZ
Demandante-Apelado

v.

UNIVERSIDAD INTERAMERICANA
Demandada-Apelante

Núm. KLAN-2000-01182

San Juan, Puerto Rico, a 6 de marzo de 2001

Panel integrado por su Presidente, el Juez Carlos Soler Aquino,
y los Jueces Colón Birriel y Escribano Medina

Escribano Medina, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos la demandada-apelante, Universidad Interamericana, solicitando la revocación de la sentencia parcial emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo, (Hon. Francisco Báez Nazario). Mediante esta se declaró ha lugar la solicitud de interdicto permanente presentada por el demandante-apelado, Dr. Arnaldo Bravo Núñez, y se dictó un interdicto preliminar a los efectos de mantener el status del

demandante como catedrático asociado de química de la Universidad Interamericana de Puerto Rico, Recinto de Arecibo.

# I

El demandante-apelante, Dr. Arnaldo Bravo Núñez, posee un doctorado en química de la Universidad de la Concepción en Chile. La Universidad Interamericana lo reclutó en el año 1985 para ejercer cátedra y desarrollar programas de Tecnología química. En el año 1992 fue nombrado catedrático Asociado y Profesor permanente.

El Dr. Alberto Vivoni, es Profesor de la Universidad Interamericana en el Recinto de San Germán; comenzó a trabajar en una propuesta federal, sometida bajo lo que se conoce como el "*Minority Science Improvements Program*", sobre un programa de computadora para modelos moleculares, el cual permite a los estudiantes internalizar conceptos abstractos, mejorando el proceso educativo. El Dr. Vivoni invitó al Dr. Bravo a participar en la propuesta y lo recomendó como coordinador de la misma. Una vez sometida la propuesta, la Rectora del Recinto de Arecibo de la Universidad Interamericana, Dra. Zaida Vega, la endosó, pero se reservó el derecho de nombrar otro coordinador distinto al apelante Dr. Alberto Bravo.

El 27 de febrero de 1998, el demandante-apelado recibió una carta del Dr. Vivoni donde se le explicaba que su nombre había sido eliminado de la propuesta. Inconforme con lo sucedido, el Dr. Bravo se querelló ante el Presidente de la Universidad Interamericana, Dr. José González, quien conforme al Reglamento de la Universidad designó un comité para investigar la querella.

El 1 de julio de 1998, la Rectora, Dra. Zaida Vega, notificó al Presidente de la Universidad Interamericana que el Dr. Bravo había violado la Política Institucional de la Universidad relacionada con el aspecto de propuestas. Le recomendó que, según las alegadas violaciones del Dr. Bravo, procedía su separación del puesto y la reubicación en otro recinto. El Presidente de la Universidad Interamericana le notificó al Dr. Bravo el archivo de la queja debido a que la Rectora del Recinto de Arecibo actuó dentro de sus facultades al excluirlo de la propuesta. Además, le notificó que lo trasladaría al Recinto de Aguadilla con el fin de satisfacer las necesidades en el área de las ciencias en dicha unidad académica.

Surge de las determinaciones de hechos formuladas por el Foro Recurrido que el Recinto de Aguadilla no ofrece grados de Bachillerato en Química; sin embargo, el Recinto de Arecibo ofrece Grados Asociados en Tecnología Química, Bachiller en Tecnología Química y Bachiller en Ciencias en Química. El Recinto de Aguadilla sólo ofrece 21 créditos en química a diferencia del Recinto de Arecibo que ofreció 79 créditos en Química y Física durante el semestre de agosto a diciembre de 1998. En el semestre de enero a mayo de 1999 se ofrecieron 76 créditos en las mencionadas materias. En ambos semestres, el Recinto de Arecibo contaba con tres profesores a jornada completa y cinco a jornada parcial. En el semestre de agosto a diciembre de 1999, el Recinto de Arecibo ofreció 73.2 créditos en Química y Física, pero esta vez con cuatro profesores a jornada completa y ninguno a jornada parcial. A su vez, el Recinto de Aguadilla durante esos semestres, ofreció 21 creditos en Química y Física con tres profesores a jornada completa.

Así las cosas, el 28 de julio de 1998, el Dr. Bravo solicitó un interdicto preliminar y permanente reclamando daños y perjuicios por la cantidad de $100,000.00 contra la Universidad Interamericana de Puerto Rico. El demandante-apelado alegó que fue eliminado de la propuesta federal en la que trabajaba y que también fue penalizado ilegal y arbitrariamente al ser trasladado de su cátedra en el Recinto de Arecibo al Recinto de Aguadilla de la Universidad Interamericana.

El 18 de diciembre de 1998, el Tribunal de Primera Instancia expidió un Interdicto Preliminar ordenando la reinstalación del Dr. Arnaldo Bravo Núñez, del Recinto de Aguadilla, lugar al cual la Universidad lo había trasladado, al Recinto de Arecibo, comenzando el semestre académico de enero-mayo de 1999.

No conforme, la demandada recurrió al Tribunal de Circuito de Apelaciones para revisar la sentencia parcial emitida por el foro de instancia. El 26 de febrero de 1999, este Tribunal emitió sentencia expidiendo el auto a los

únicos fines de exigir al demandante la prestación de una fianza razonable. ■

Posteriormente, la demandada recurrió nuevamente mediante *certiorari* ante el Tribunal de Circuito de Apelaciones, el 16 de junio de 1999, conjuntamente con una Moción en Auxilio de Jurisdicción. El 7 de julio de 1999, este Tribunal emitió resolución desestimando la demanda por falta de jurisdicción por no haber incluido ciertos documentos en el apéndice del recurso y declaró no ha lugar a la Moción en Auxilio de Jurisdicción. ■

El caso continuó los procedimientos ante el foro de Instancia y se procedió a señalar la vista del *Injunction* Permanente para el día 19 de octubre de 1999. Luego de desfilada la prueba, el tribunal de instancia emitió sentencia el día 10 de agosto de 2000. En la misma declaró ha lugar la solicitud de *Injunction* Permanente y se dictó orden para mantener el status del demandante como Profesor Asociado de Química de la Universidad Interamericana, Recinto de Arecibo.

Inconforme, la parte demandada, Universidad Interamericana presentó escrito de apelación ante el Tribunal de Circuito de Apelaciones el 25 de octubre de 2000, alegando que el tribunal de instancia cometió los siguientes errores:

*"Erró el Tribunal de Instancia al concluir que la Universidad no podía trasladar de una unidad académica a otra al demandante-apelado a no ser que dicho traslado fuera solicitado o consentido por éste.*

*Erró el Tribunal de Instancia al interpretar de forma aislada la disposición del Manual y las demás normativas institucional, toda la cual forma parte del contrato de trabajo entre el profesor y la Universidad.*

*Erró el Tribunal de Instancia al brindar una interpretación a las disposiciones del Manual de Facultad, contraria a la intención de la Universidad al promulgar las mismas según fuera presentada al Tribunal mediante el testimonio irrefutado de su presidente.*

*Erró el Tribunal al determinar que el traslado del demandante-apelado constituyó la imposición a este último de una sanción disciplinaria sin observar los procedimientos disciplinarios dispuestos en el Manual de Facultad cuando la prueba irrefutada que le fue presentada demostró claramente el que el Presidente de la Universidad no pretendió disciplinar o sancionar al demandante-apelado al asignarlo a trabajar en el Recinto de Aguadilla de la Universidad."*

## II

El caso ante nuestra consideración trata sobre un problema contractual entre la Universidad Interamericana y el apelado, el Dr. Bravo. La controversia que debemos resolver gira en torno a si el traslado del Dr. Bravo se hizo conforme lo dispone el Manual de la Facultad. En otras palabras, si se podía o no trasladar al Dr. Bravo y si ello constituye un castigo o acción disciplinaria.

La intervención de los tribunales usualmente se da para garantizar el debido procedimiento de ley en atención a los intereses de propiedad que, regularmente, se configuran con relación a la permanencia de un profesor en una institución educativa del Estado. *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987); *Selosse v. Fundación Educativa Méndez*, 122 D.P.R. 534 (1988).

Aun cuando los tribunales deben ser cautelosos y prudentes al intervenir con procedimientos de evaluación de profesores que laboran en instituciones educativas de nivel superior, esto no es óbice para el escrutinio judicial, particularmente, y con mayor razón, en situaciones que versan sobre interpretación de un contrato. *García Cabán v. U.P.R., supra; Consejo Educación Superior v. U.I.A.*, 120 D.P.R. 224 (1987). El mero hecho de que una institución universitaria esté involucrada en una disputa contractual no es suficiente para activar la norma de abstención judicial, pues implicaría, para todos los efectos prácticos, favorecer *a priori* una de las partes contratantes. Ello conllevaría convertir las universidades privadas en zonas de dominio absoluto con potestad exclusiva de interpretación de contratos. Ese enfoque no es permisible. La revisión del contrato, como cualquier

otro, debe hacerse sin favorecer a la universidad. *Selosse v. Fundación Educativa Méndez, supra.*

En armonía con este lineamiento doctrinal, el contexto fáctico de autos demuestra que el Manual de la Facultad de la Universidad Interamericana es parte del contrato entre la Universidad Interamericana y el Dr. Bravo. Por su parte, el Art. 1044 del Código Civil dispone que *"[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos".* 31 L.P.R.A. sec. 2994. Los tribunales están facultados para velar por su cumplimiento. *Cervecería Corona v. Commonwealth Ins. Co .,* 115 D.P.R. 345 (1984); *López de Victoria v. Rodríguez,* 113 D.P.R. 265 (1982).

No existe duda en cuanto a la autoridad que tiene un tribunal civil para intervenir en la interpretación de un contrato *"libremente negociado y acordado"* entre dos entes privados. *Díaz Hernández v. Colegio Nuestra Señora del Pilar,* 123 D.P.R. 765 (1989). La intervención del tribunal intenta hacer cumplir la voluntad de las partes y vindicar sus intereses contractuales. Nuestro derecho reconoce el principio de autonomía contractual de las partes, quienes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, la moral y el orden público. Artículo 1207 del Código Civil, 31 L.P.R.A. sec. 3372. Además, estando los tribunales facultados para velar por su cumplimiento, éstos no deben relevar a una parte del cumplimiento de su obligación contractual cuando dicho contrato sea legal y válido y no contenga vicio alguno. *Cervecería Corona v. Commonwealth Ins. Co.,* 115 D.P.R. 345 (1984); *Olazábal v. U.S. Fidelity Etc.,* 103 D.P.R. 448 (1975). Véase *Mercado Rivera v. Universidad Católica,* **97 J.T.S. 106**.

Cuando una universidad privada cuenta con una Reglamentación que rige los procedimientos de traslados de profesores ambas partes deben cumplir estrictamente con la misma. De lo contrario, se estaría violando el principio de *pacta sunt servanda* que nutre toda relación contractual *Selosse v. Fundación Educativa Méndez, supra.*

La parte demandada-apelante arguye que el traslado del Dr. Bravo estaba dentro de los poderes que le confiere implícitamente el Manual de Facultad que es, a su vez, el contrato entre las partes. Que en virtud de éste, el presidente de la Universidad tiene el poder para remover y trasladar a los profesores a cualquiera de los once recintos de la Universidad Interamericana si considera que es necesaria la presencia de algún catedrático para fortalecer o mejorar los niveles de enseñanza educativa. Por otro lado, el demandante-apelado alega que el traslado fue una sanción disciplinaria en su contra y que si esto fue así, él no tuvo la oportunidad de defenderse de ello. Además, que el traslado fue hecho en contravención de lo dispuesto en el Manual de la Facultad.

La sección 3.4.11, Parte III del Manual de la Facultad dispone lo siguiente:

*"Política sobre traslados*

*La Universidad permite a los miembros de la facultad trasladarse de una a otra unidad o dentro de la misma unidad, en las siguientes circunstancias:*

*1. Cuando haya un puesto de naturaleza apropiada en la unidad o subunidad a la que el miembro de la facultad desee trasladarse. La naturaleza adecuada se refiere a la disciplina y a los requisitos del puesto, tipo de nombramiento (temporero, probatorio, permanente), rango y sueldo autorizado para el puesto.*

*2. Cuando el director de departamento, el decano de estudios o el decano de asuntos académicos o el decano asociado de asuntos académicos y el funcionario principal de la nueva unidad accedan al traslado. En igualdad de condiciones, se da preferencia en la selección al miembro de la facultad que solicite el traslado.*

*3. El traslado se efectúa en el momento y en la forma en que no perjudique al programa, ni a las ofertas de cursos en las respectivas unidades.*

*4. En caso de cambios en el programa docente o de exigencias fiscales en una unidad, la Universidad trata*

*de trasladar a los miembros de la facultad afectados a otra unidad, si dichos miembros están de acuerdo con el traslado.*

*La Universidad, hasta donde sea posible, anunciará la disponibilidad de plazas a la comunidad universitaria para que los miembros de la facultad que interesen aspirar a las mismas puedan solicitar traslado."*

De una lectura de esta sección, podemos concluir que el traslado debe tener el consentimiento de ambas partes, tanto de la Universidad como del Profesor. Tanto es así que en los casos de cambios al programa docente o por causa de exigencias fiscales se requiere el acuerdo de los miembros para efectuar el traslado. La Universidad tampoco cumplió con el último párrafo de la citada sección, ya que no anunció la disponibilidad de la plaza en el Recinto de Aguadilla.

La parte apelante explicó en el juicio que su intención al promulgar el Reglamento fue darle a conocer a los miembros de la facultad las circunstancias o criterios bajo los cuales la Universidad puede conceder un traslado y que el traslado al demandante no fue una sanción disciplinaria, por lo que no tenían que seguir ese proceso.

No dudamos que la intención de la Universidad sea la de dar a conocer un traslado; sin embargo, la clara redacción del Reglamento requiere la consulta al profesor sujeto del traslado. Ello no ocurrió en este caso.

Es evidente que existe una laguna entre la intención de la Universidad al promulgar su Reglamento y el texto final resultante. No tenemos duda de que para implementar la intención del apelante, hay que superar el defecto en la redacción del Reglamento.

Dicho en otras palabras, el Manual de la Facultad no contiene sección alguna que le de poder al Presidente para trasladar a un Profesor sin el consentimiento de éste. Los hechos presentados apuntan a que la medida de trasladar al Dr. Bravo constituyó una violación del contrato.

Nos resta por analizar si el traslado del Dr. Bravo constituyó o no una sanción disciplinaria sin que se observaran los procedimientos pertinentes que surgen del Manual de la Facultad. La parte apelante entiende que el traslado fue con el propósito del mejoramiento académico del recinto. Sin embargo, obra en los autos la carta con fecha de 27 de abril de 1998 enviada por la Dra. Zaida Vega Lugo, Rectora del Recinto de Arecibo, al Presidente de la Universidad Interamericana, Dr. José R. González; esta derrota la alegación de que el traslado se efectuó para el mejoramiento académico del Recinto de Aguadilla. ■ No puede perderse de vista que la cantidad de créditos de Química y Física ofrecidos por cada uno de los recintos es considerablemente mayor en el Recinto de Arecibo que en el de Aguadilla, y el Recinto de Aguadilla ni siquiera cuenta con un grado en Química.

Debemos entonces concluir que el traslado del Dr.Bravo no se efectuó para mejorar el desarrollo académico en el Recinto de Aguadilla.

Surge entonces la interrogante: ¿Fue una acción disciplinaria? Cuando se trata de sanciones disciplinarias, el Manual de Facultad provee que:

*"Se entenderá por sanción disciplinaria a los fines del presente Manual aquella medida disciplinaria o acción que la Universidad podría tomar en los casos donde un miembro de la Facultad incurra en violaciones a las normas institucionales u otro tipo de conducta detallada en este Manual. La sanción disciplinaria en cada caso depende de las circunstancias particulares del mismo.*

*Las sanciones disciplinarias pueden incluir amonestación verbal o escrita, suspensión de empleo y sueldo, terminación de empleo y cualquier otra acción que corresponda conforme las circunstancias del caso.*

*No se tomará o propondrá la imposición de una sanción disciplinaria a un miembro de la Facultad sin antes haber realizado una investigación del asunto brindándole al miembro de la Facultad la oportunidad de aportar*

*su versión e información pertinente al proceso investigativo."*

En el caso ante nuestra consideración, aunque sí se nombró una comisión [4] para que investigara la querella del Dr. Bravo, no se le dio a éste la oportunidad para defenderse. Por lo tanto, la sanción disciplinaria tampoco fue llevada a cabo según lo dispone el Manual de la Facultad. Como hemos visto, ninguno de los errores señalados fue cometido.

### III
Por los fundamentos antes expresados, se confirma la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General

### ESCOLIOS 2001 DTA 128

**1.** KLCE-1999-00036.

**2.** KLCE-1999-00631.

**3.** Carta de 27 de abril de 1998, apéndice del apelado. *"Si alguien ha sido afectada por los manejos que aquí le resumo, he sido yo como Rectora, sobre quien este profesor ha tratado de imponerse desde mi llegada al Recinto de Arecibo en 1990, tanto violando las normas institucionales como obviando las prácticas tradicionales a las que estamos acostumbrados nosotros."*

**4.** La Rectora Dra. Zaida Vega Lugo nombró un Comite constituido por la Prof. Annette Vega, el Prof. Pedro Serrano Toro y el Dr. Michael Domenech.