**Dra. Maria Virginia HERNANDEZ LORING, Plaintiff,**

v.

**UNIVERSIDAD METROPOLITANA, et al., Defendants.**

No. Civ. 97–1215(SEC).

United States District Court, D. Puerto Rico.

Aug. 20, 1999.

Wilfredo A. Geigel, Christiansted, St. Croix, VI, for plaintiff.

José E. De–la–Cruz–Skerrett, San Juan, PR, for defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is a motion for summary judgment filed by defendants

Universidad Metropolitana, Rene Labarca, Luis R. Diaz Rivera, Carmen Bigas, Marta Ramos, Nilda Lopez, Maria del C. Monserrat and Sistema Universitario Ana G. Mendez. (Docket # 52). After a careful analysis of the parties' argument and the applicable law, we GRANT defendants' motion for summary judgment.

Plaintiff Maria Virginia Hernandez Loring ("Hernandez–Loring") brings this action pursuant to 28 U.S.C. § 1332, claiming damages for negligence, under Article 1802 of Puerto Rico's Civil Code. Hernandez–Loring, a linguistics professor hired by the Universidad Metropolitana, claims that university officials conducted her tenure evaluation in an arbitrary and capricious manner, and contrary to the criteria established by the University's rules, regulations and procedures.

Plaintiff's claim relies on two grounds; first, that one of the members of her review committee, Luis R. Diaz Rivera ("Diaz–Rivera") was a known sexual harasser of students and faculty alike, and that he prevented her promotion in reprisal for plaintiff's refusal to succumb to his sexual advances. Furthermore, Hernandez–Loring claims that the faculty committee which prevented her promotion to full professor was not properly qualified to review her qualifications and accomplishments. Finally, she contends that the "hostile work environment" created by Diaz–Rivera and University Chancellor Rene Labarca before, during, and after her petition for tenure compelled her to resign and seek employment elsewhere. Although she does not invoke any other source of federal jurisdiction, a review of her allegations lead this Court to conclude that she may invoke Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e–3 et. seq., pursuant to her sexual harassment claims. Despite the intertwined nature of her claims, we feel that a separate discussion of each claim would expedite the resolution of this case. Thus, we proceed to solve each claim seriatim.

### Applicable Law/Analysis

As noted by the First Circuit, "[s]ummary judgment has a special niche in civil litigation." It serves "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). This device "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314–315 (1st Cir.1995).

According to Fed.R.Civ.P. 56(c), a summary judgment motion should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28 (1st Cir.1994). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the nonmoving party. *U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992). *See also, Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

Moreover, this Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* (citing *Greenburg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines,* 42 F.3d at 684.

This Court had an opportunity to elucidate the purpose of the summary judgment procedure, as established by the seminal trilogy of cases decided by the United States Supreme Court in *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See Smith v. Williams Hospitality,* 950 F.Supp. 440 (D.Puerto Rico 1997). Citing the Supreme Court of New Jersey in *Brill v. Guardian Life Insurance Co. of America,* 142 N.J. 520, 666 A.2d 146 (1995), this Court explained:

> After early debate about the breadth of the summary judgment power, the jurisprudence of summary judgment was rather uniform until 1986 . . . In that year the United States Supreme Court upheld summary judgments in three cases, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Anderson v. Liberty Lobby, and Celotex Corp. v. Catrett* (citations omitted). Matsushita was decided in March whereas *Liberty Lobby* and *Celotex* were decided the same day in June. The fact that the Court addressed the summary judgment standard three times within four months suggests how significant the issue had

> become . . . . . Read together,*Matsushita, Liberty Lobby* and *Celotex* adopted a standard that requires the motion judge to engage in an analytical process essentially the same as that necessary to rule on a motion for a directed verdict: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Liberty Lobby,* supra 477 U.S. at 251–52. That weighing process requires the court to be guided by the same evidentiary standard of proof—by a preponderance of evidence or clear and convincing evidence—that would apply at the trial on the merits when deciding whether there exists a "genuine" issue of material fact. Id. at 254–56, 106 S.Ct. 2505.

*Brill* at 530, 533–34, 666 A.2d 146.

The *Brill* Court, as quoted in *Williams Hospitality,* went on to explain the practical consequences of the *Celotex* trilogy, as it was applied throughout different jurisdictions across the country:

> The Arizona Supreme Court has aptly described why so many jurisdictions have adopted the standard articulated in *Celotex* and *Liberty Lobby.* It stated: 'We live in what is widely perceived as a time of great increase in litigation and one in which many meritless cases are filed, vastly increasing the dockets before our trial judges. As a result, the courts of this country have been urged to liberalize the standards so as to permit summary judgment in a larger number of cases.' See, e. g., *Report of the Commission on the Courts, The Future of Arizona Courts,* at 62 (1989) [*Orme School v. Reeves,* 166 Ariz. 301, 802 P.2d 1000, 1003–04 (1990).]

*Id.* at 539, 666 A.2d 146.

The *Brill* Court added:

> It is critical that a trial court ruling on a summary judgment motion not "shut a deserving litigant from his [or her] trial." . . . At the same time, we stress that it is just as important that the court

not "allow harassment of an equally deserving suitor for immediate relief by a long and worthless trial." ... If these general rules are applied by the courts with discernment and care, the summary judgment procedure, without unjustly depriving a party of a trial, can effectively eliminate from crowded court calendars cases in which a trial would serve no useful purpose and cases in which the threat of trial is used to coerce a settlement. To send a case to trial, knowing that a rational jury can reach but one conclusion, is indeed "worthless" and will "serve no useful purpose."

*Id.* at 540–41, 666 A.2d 146

The *Brill* Court added the following postscript to its analysis of the summary judgment standard, which we heartily endorsed in *Williams Hospitality* and we heartily endorse now:

The thrust of today's decision is to encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves. Some have suggested that trial courts out of fear of reversal, or out of an overly restrictive reading of [the case law] or a combination thereof, allow cases to survive summary judgment so long as there is any disputed issue of fact. As to fear of reversal, we believe our judges are made of sterner stuff and have sought conscientiously over the years to follow the law.

*Id.* at 541, 666 A.2d 146 (cited in *Williams Hospitality*, 950 F.Supp. at 444).

Pursuant to the abovementioned case law, we proceed with our analysis.

### Due Process Claim

■ Although plaintiff may not invoke a Due Process violation of the Fourteenth Amendment by virtue of the University's private status, the Puerto Rico Supreme Court has recognized an analogous claim against private institutions who arbitrarily deny tenure to a faculty professor, in violation of its own rules and regulations. In *Selosse v. Fundacion Educativa Ana G.*

*Mendez,* 122 D.P.R. 534, 1988 WL 580750 (1988), a college professor sued a private university (indeed, one of the very same parties involved in the present case-Fundacion Ana G. Mendez) claiming that school officials had discriminated against her in its decision to deny her tenure. The Court held that the contract between plaintiff and the university had incorporated the statutes and bylaws regarding the procedures to grant or deny tenure. *Id.* at 548–549, 1988 WL 580750. The Court concluded that courts had an obligation to ensure that such procedural measures, once granted to the plaintiff, were followed by the defendants. *Id.* at 549, 1988 WL 580750.

Although upon initial review, Hernandez–Loring's claim has an eery resemblance to the *Selosse* case, a closer scrutiny of the facts of the present case compel a different outcome.

Plaintiff contends that the faculty committee which denied her promotion to full professor was not properly qualified to review her qualifications and accomplishments. A review of the evidence fails to review any serious deficiencies by the faculty committee members that would preclude summary judgment against plaintiff. Four of the five committee members had a similar or higher academic rank than petitioner Hernandez–Loring. Luis R. Diaz Rivera had an Education degree in General Education, Carmen Bigas, an Assistant Professor, held a Master's Degree in Nursing, Martha M. Ramos, an Associate Professor, had a Master's Degree in Business, Nilda Lopez, an Associate Professor, obtained a Ph.D. in Family Sociology and Maria del C. Monserrat was Full Professor with a Ph.D in Spanish. Diaz–Rivera was a fellow member of the Education Department in which Hernandez–Loring worked. (Docket # 58, p. 5, paragraph 12)

Petitioner would like her peer review committee to be strictly construed to mean fellow professors in the field of linguistics. In that way, Hernandez–Loring contends, her academic accomplishments and intel-

lectual contributions to her field could be properly assessed. The Court declines to acquiesce to plaintiff's request. To do so would improperly constrict the University's freedom to design a workable tenure review committee. Defendants contend, and this Court agrees, that it would be practically impossible to design committees tailor-made for each academic or professional subspecialty in the University. Even if it were possible to design such committee for certain academic areas, this would not only be unfair for all those tenure petitioners in other arcane areas, but would also reek of impropriety and academic cronyism, as the same five-person "mafia" would promote each other ad infinitum, in an unseemly display of academic "kiting" [1] and "leapfrogging."

Furthermore, she seeks to relitigate the entire evaluation process of the tenure review committee, claiming the numerical assessment ascribed to her,—which fell considerably below the assessment given to the other three tenure applicants—was improperly calculated. Furthermore, plaintiff claims that the committee should have taken into account all her published work instead of only those publications for which she was not remunerated. She also claims that review committee did not accurately take into account her extracurricular activities in faculty committees and with her students. Finally, she argues that the appeal process to seek review of the committee's denial of tenure is a "sham", which has compelled her to seek redress in this forum.

In *Latimore v. University of North Carolina at Charlotte*, 669 F.Supp. 1345 (W.D.N.C.1987), the Court faced a situation similar to the present case, where plaintiff claimed that the review committee denied him tenure due to his age, and that the appeal process was also tainted by discriminatory animus against him. Ac-

cordingly, plaintiff attacked the review committee's evaluation procedures. Due to its legal and factual pertinence to the present case, we cite liberally from the *Latimore* Court's opinion. We believe that the *Latimore* Court's most enduring contribution is its explanation of the University's need to retain broad discretionary power over its tenure appointments, and ultimate control over the academic, intellectual and personal makeup of its academic universe. The *Latimore* Court expounded:

> Tenure is one of the most difficult of all academic decisions. "[T]enure is a privilege, an honor, a distinctive honor, which is not to be accorded to all ... professors. It is a very high recognition of merit [and] the ultimate reward for ... academic excellence. It is to be awarded in the course of search for fundamental merit." *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1353 (W.D.Pa.1977). It is a decision which, in addition to delineating basic qualifications, involves a degree of subjectivity. Furthermore, since professors are individuals and perform different roles within a department, it is difficult to compare the reasons for promoting one faculty member with the reasons for promoting or not promoting another. (citing *Smith v. University of North Carolina*, 632 F.2d 316, 344–45 (4th Cir. 1980)).

*Id.* at 1351–52.

We also adopt the *Latimore* Court's rationale to rebut plaintiff Hernandez–Loring's claims that this Court must impeach the review committee procedures that led to the denial of her tenure application.

> A teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, deter-

---

**1.** The term "kiting" is borrowed from a white-collar crime term, where a person writes checks from several accounts in different banks, and transfers the same money from bank account to bank account, seeking to

outpace the respective banks' check-processing system. Eventually, this "kiting" scheme collapses once the banks detect this "ping-pong" movement of the same amounts from bank to bank.

minations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests. These determinations are in "an area in which school officials must remain free to exercise their judgment," especially since these determinations present unique questions for judgment by those with expertise in the specialized academic area, capable of making professional evaluations of those elusive and intangible qualities and talents expected of the scholar and teacher. **Courts are not qualified to review and substitute their judgment for these subjective, discretionary judgments of professional experts on faculty promotions or to engage independently in an intelligent informal comparison of the scholarly contributions or teaching talents of one faculty member denied promotion with those of another faculty member granted a promotion; in short, courts may not engage in "second-guessing" the University authorities in connection with faculty promotions. Yet that is exactly what the plaintiff seeks by his action to have the court do.** *Id.* at 1352 (emphasis added)(citing *Clark v. Whiting*, 607 F.2d 634, 639 (4th Cir. 1979)).

The *Latimore* Court's conclusion is instructive in its directness and in its legal reasoning. Accordingly, we cite *Latimore*'s *denouement* in its entirety:

In summary, Plaintiff was reviewed by his peers on a properly constituted committee organized for the purpose of determining whether he should receive tenure. What Plaintiff is seeking is for a jury to reverse the subjective judgment by the faculty members of the review committee with no evidence of discrimination against Plaintiff by the committee because of Plaintiff's age.

**In practically all walks of life, especially in business and the professions, someone must be charged with the ultimate responsibility of making a final decision, even as are the Courts. The computer, highly developed though it may be, is not yet qualified to digest the punch cards of an entire faculty and advise the waiting and expectant onlooker of its decision as to hiring or promotion.** Even were it so capable a new rule would have to be added to appellate rules entitled "Appeal from a Computer."

*Id.* at 1352–53 (emphasis added) (citing *Faro v. New York University*, 502 F.2d 1229, 1232 (2nd Cir.1974)).

Ordinarily, finding no egregious procedural miscarriages of justice in the committee's decision to deny tenure to plaintiff, we would "stop looking further." However, we must address the sexual harassment "twist" which plaintiff claims colored her denial of tenure.

### Title VII/Sexual Harassment

#### Quid Pro Quo

 As noted previously, plaintiff Hernandez–Loring contends that Luis Diaz–Rivera, as an influential member of her tenure review committee, prevented her promotion in retaliation for plaintiff's refusal to succumb to his sexual advances. In order for Hernandez–Loring to prevail pursuant to the doctrine of "quid pro quo" sexual harassment, she must prove:

1. that she was a member of a protected class;

2. that she was subject to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors;

3. that the harassment complained of was based on sex;

4. that submission to the unwelcome advances was an expressed or implied condition for receiving job benefits or that refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and

5. the existence of respondeat superior liability.

*Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 785 (1st Cir.1990); *Ruiz v. Caribbean,*

54 F.Supp.2d 97 (D.Puerto Rico 1999); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998).

Additionally, as noted previously, Hernandez–Loring contends that the "hostile work environment" created by Diaz–Rivera and Chancellor Rene Labarca before, during, and after her petition for tenure compelled her to resign and seek employment elsewhere.[2]

■ In order for plaintiff Hernandez–Loring to successfully bring a "hostile environment" sexual harassment claims, she must prove that:

1. she belongs to a protected group;

2. she was subjected to unwelcome sexual harassment;

3. the harassment was based on sex;

4. the harassment affected a term, condition or privilege of employment and;

5. the employer knew or should have known of the harassment and failed to take proper remedial action.

*Meritor Savings Bank v. Vinson*, 106 S.Ct. at 2404; *Ruiz v. Caribbean*, 54 F.Supp.2d 97.

■ Furthermore, plaintiff must allege that defendants actions were sufficiently severe or pervasive enough as to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive. *Harris*, 114 S.Ct. at 370. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

■ In order for the Court to determine whether an environment is "hostile" or "abusive," it must look at all the circumstances. These may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris*, 114 S.Ct. at 370; *Faragher*, 118 S.Ct. at 2283.

Pursuant to plaintiff's claim that the "hostile work environment" at the Universidad Metropolitana led to her "constructive discharge," we must define the legal term of art, "constructive discharge." The First Circuit has noted in *Greenberg v. Union Camp. Corp.*, 48 F.3d 22, 27 (1st Cir.1995):

"It is well settled in this Circuit that, to establish a claim of constructive discharge, the evidence must support a finding that 'the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)); *see also Vega*, 3 F.3d at 480 (new conditions must make work so "arduous," "unappealing" or "intolerable" that a reasonable person would resign). The legal standard to be applied is "objec-

**2.** Defendants claim that Hernandez–Loring left the Universidad Metropolitana not due to a "hostile work environment," but due to her inability to accommodate her teaching duties with her husband's commitments in the Washington, D.C./Virginia area. According to plaintiff's own witness, Dr. Aida Andino, Hernandez–Loring moved to the Washington/Virginia area after Hernandez–Loring's marriage to Dr. Claudio Prieto. Moreover, Hernandez–Loring requested and was granted permission by Universidad Metropolitana to commute on the weekends from Puerto Rico to the D.C./Virginia area. (Docket # 58, Reply to Plaintiff's Opposition to Summary Judgment, paragraph 24, Exhibit VI, Deposition of Aida Andino, pp. 11–12; Exhibit VII, Deposition of Sonia Cabanillas, pp. 37–38.);(Docket # 51, Pretrial Memorandum, p. 4).

tive," with the inquiry focused on "the reasonable state of mind of the putative discriminatee." *Calhoun*, 798 F.2d at 561 (internal quotations omitted). Consequently, "an employee may not be unreasonably sensitive to his or her working environment."

Plaintiff's "eleventh-hour allegations," as delineated in her affidavit filed with her opposition to the motion for summary judgment include several incidents which, in her view, constitute sufficient grounds to establish claims under "quid pro quo" and "hostile work environment," to wit:

On November 27, 1991, during a Thanksgiving Day's lunch in the library of Universidad Metropolitana, plaintiff sat in a table with some professors from the Education Department. According to plaintiff, Dr. Diaz Rivera accosted her, sat very close to her and told her in an allegedly suggestive manner: "Maria Virginia, you are so tasty that getting laid with you just once is not enough: at least three or four times is needed." (Docket # 53, Opposition to Motion for Summary Judgment, Exhibit 1, Paragraph 16 A) Plaintiff contends she was surprised, afraid, embarrassed and ashamed by Diaz–Rivera's insinuating physical nearness as well as by his lascivious comments toward her. Diaz–Rivera's actions prompted her to immediately leave the Thanksgiving luncheon, never to participate in such luncheon again. Hernandez–Loring spent the rest of the day in a depressive and anxious mental state. Id., Par. 16 A.

At approximately 9:30 a.m. on August 24, 1995, plaintiff attended a Faculty Workshop at the University's Amphitheater. While seeking for a seat, Dr. Diaz Rivera said to Hernandez–Loring: "Maria Virginia, this happened to you for being such a bitch." Id., Par. 16 B. This incident, plaintiff points out, is the clearest example that bolsters her "quid pro quo" claim and indicates a clear link between her rejection of Dr. Diaz–Rivera's sexual advances and her denial of tenure. Finally she alleges that several students told her

that Diaz–Rivera often uttered sexually-suggestive commentaries in the classroom, mainly directed toward the female students. Id., Par. 16.

One particularly offensive scenario portrayed him saying: "Even though I am fifty-three years old, I am an expert in the tongue of the Low Countries," which one student construed as a crude reference to female body parts. Shortly after this comment, he addressed a female student and told her "I am glad that we speak the same tongue." (Docket # 53, Exhibit 12, Affidavit of Mayra del Valle Ortiz, paragraph 4A). These latter incidents are confirmed in the depositions of several of her students, whom she requested to testify on her behalf. (Docket # 53, Exhibits 12, 14, 15)

Additionally, plaintiff claims that on July 13, 1995 she was sexually accosted and manhandled by Chancellor Labarca, who was in a drunken stupor. Plaintiff narrates that during the faculty luncheon at the Condado Convention Center, Chancellor Labarca slid very close to her and, in full view of other faculty and administration officials, grabbed her arm and told her "Maria Virginia, you are just like a 'piruli.' Even though I have transferred you from your Department, and all, I'm going to protect you." After a serious struggle, she managed to extricate herself from his grip and told him to "leave her alone." This public incident with Labarca, which lasted approximately ten minutes, led her to suffer a tachycardia episode, which forced her to abandon yet another University -sponsored luncheon and deal with her "anxiety, outrage, indisposition and depression." (Docket # 53, Exhibit 1, Par. 16 C)

These incidents, coupled with several other instances in which Dr. Diaz Rivera sought futilely to ask her out, as well as her retaliation-derived professional stagnation, created such a "hostile work environment" that she had no other alternative than to leave the University where she had worked for more than twenty years, and

move to the state of Virginia with her husband.

Despite Hernandez–Loring's apparently harrowing tale, we must closely scrutinize her allegations. Although we must give all reasonable inferences to plaintiff's allegations, the timing and nature of Hernandez–Loring's affidavit undermine any possibility of treating plaintiff's allegations as "reasonable inferences." To reiterate the First Circuit's admonition on the Court's application of the federal summary judgment standards, a Court has an obligation to weed out claims whose claims rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

Plaintiff's allegations, have evolved in time from a mere claim of arbitrary denial of tenure, to a claim of "quid pro quo" sexual harassment and retaliation, to an additional claim of "constructive discharge" due to a hostile work environment, to further allegations of sexual harassment by Dean Rene Labarca, culminating in a conspiracy between Diaz–Rivera, Carmen Bigas, Marta Ramos, Nilda Lopez, Maria del C. Monserrat and Dean Rene Labarca to refuse Hernandez–Loring's tenure petition, motivated by Diaz–Rivera's sexual frustrations toward plaintiff. Furthermore, her eleventh-hour flood of recollections regarding Diaz–Rivera and Chancellor Labarca's sexual misconduct, conveniently remembered several months after her deposition and only after defendants had filed their motion for summary judgment, strikes the Court as specious, at best.[3]

A careful review of Hernandez–Loring's deposition fails to reveal any substantive allegations of sexual misconduct or discriminatory animus by either Diaz–Rivera or Labarca towards plaintiff.

A. I had a bad experience with Dr. Diaz.

Q. With Dr. Diaz?

A. Aha.

Q. What was that bad experience about?

A. When I was entering the room where they were projecting some slides Dr. Diaz made a very unpleasant remark.

Q. Toward you?

A. Toward me.

Q. What did that remark consist of?

A. Dr. Diaz told me that If I had done other things the results of my evaluation would have been different.

Q. To what was Dr. Diaz referring about "other things," if you know?

3. Wright and Miller explain this issue clearly and concisely, and thus we quote liberally from their text: "An interesting problem is posed when the party moving for summary judgment does so on the basis of a deposition of a nonmoving party that contains matters entitling the movant to judgment, but then the nonmoving party introduces a later-made affidavit contradicting those statements." The question is whether the court can disregard the affidavit and grant summary judgment, or must refuse to do so because a credibility issue then is posed that must be resolved by the jury. Although some courts have ruled that conflicts between depositions and later-filed affidavits present questions of credibility, precluding summary judgment, several courts have suggested that summary judgment may be granted under those circumstances, or that the affidavit may be disregarded or stricken as sham. The facts of this case compel the Court to adopt the latter view. *See Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343 (6th Cir.1991) (After party filed motion for summary judgment, thus challenging other party's evidence, nonmoving party may not create factual issue by filing affidavit contradicting earlier deposition testimony); *Palmer v. Circuit Court of Cook County*, 905 F.Supp. 499 (D.C.Ill.1995) (Unsubstantiated and self-serving testimony in an affidavit that contradicts earlier deposition testimony is not sufficient under the summary-judgment rule to create a genuine issue of material fact, and defeat an otherwise properly supported motion for summary judgment, when there is no other corroborating evidence in the record to support the statement.) Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d*, S. 2726. p. 448.

A. Going out with me.

Q. Going out with you?

A. Aha.

Q. How did you come to that determination, that that was what he meant?

A. The way that he said it and other words that he used.

Q. What other words did he use?

A. I don't recall specifically.

Q. You don't recall them?

A. No.

Q. Is there a possibility that you will recall them sometime?

A. Yes.

Q. At what moment could you recall them, under what conditions?

A. Perhaps at another time.

Q. But now is when we need the information, doctor, not later, if you could recall, that means that you know.

A. "That is you had gone out with me you would have . . .—something like that—like going to bed with me, we would have had another . . . another result."

Q. And to what did he refer with respect to result?

A. To the awarding of rank.

Q. To the awarding of rank. Do you recall what specific day that was?

A. It was the first day of the faculty workshop.

. . .

Q. Was there anyone close to you or Mr. Diaz when he made those statements that you allege he made?

A. I was entering the theater, in the theater they were showing some slides, I don't recall . . . there were people, I don't recall who was around.

Q. You don't recall. Those persons who were around, could they have heard what he said to you?

A. Probably, I don't know.

Q. Probably yes or no, or you don't know.

A. I don't know.

Q. You don't know. Right now are you in any condition to tell us whether there was any witness of such event or encounter?

A. No, I am in no condition to tell you.

Q. Do you think that you could recall it at some time?

A. I don't think so, it was very . . . it was not pleasant, it was very unpleasant, I don't recall.

(Docket #52, Exhibit J, Deposition of Hernandez–Loring, pp. 5–8, Certified Translation).

Plaintiff Hernandez–Loring continued at a law stage of her deposition to "stonewall" on the requested information regarding the specific details of each incident of alleged sexual misconduct, as well as the identification of any other persons who could corroborate these incidents:

Q. Doctor, what other element of hostility, we've already talked about three, about two, any other one?

A. It's that I can't talk . . . no, the hostile environment.

Q. Who produced . . . how did Dr. Diaz contribute or produce a hostile environment, doctor, who is the one you are charging with hostility? In what way did he contribute to a hostile environment, doctor?

A. A hostile environment before . . . with professors and students.

Q. Aha. How?

A. Harassing professors and students.

Q. Talk to me about you, doctor, you are the one making the charge here, no one else . . .

A. I make the charge . . .

Q. ... has made any other charge except for you, talk to me about facts, about you, doctor.

A. Interrupting my classrooms.

Q. You already told us about that.

A. Comments in the hallway, "Maria Virginia, when are we going out." I was hearing consistent complaints from my students.

Q. Which students, tell me names and surnames, circumstances ...

A. That no..

Q. ... date and places, Doctor?

A. My students consistently.

Q. Which students, Doctor, tell me name, surname ...

. . .

A. Right now, I can't say the names, I don't recall the names of the students but I do recall their complaints, I do recall specifically what they have been suffering in the classrooms.

Q. Doctor, name, surname, circumstances, dates?

. . .

Q. What you are testifying here is not admissible in a court in any manner and you have a very serious charge against this doctor.

A. I understand that to be so.

Q. And what I want is for you to place us in the condition of establishing whether you are telling the truth about the charge you are making.

A. There are sworn statements of students.

. . .

Q. Tell me, who are those students who have those sworn statements?[sic]

A. Right now I cannot tell you their names ...

Q. Who took those sworn statements?

A. Attorneys.

Q. Attorneys. And why do you know about those sworn statements ...?

A. Because the students have come to ask me to help them.

Q. Yes, now identify ...

A. ... because they are being harassed and they have been harassed consistently by Mr. Diaz inside his classroom.

Q. Identify the names of those persons for me?

A. Right now I cannot identify those names, counselor.

Q. Do you mean to tell me that you know that those students have been going to you to complain about conditions with Dr. Diaz, and you know that there are attorneys who have intervened with those students, that there are sworn statements given and you're telling me here under oath that you don't know the names of those students?

Mr. Wilfredo Geigel (Plaintiff's attorney): That, I'm going to get the names ... I'll get them for you.

**(Docket # 52, Exhibit I, Deposition of Hernandez–Loring, pp. 64–68, Certified Translation)**

In view of the mysterious and unexplained omissions in Hernandez–Loring's deposition regarding Diaz–Rivera and Labarca's improper conduct, conduct which was subsequently and conveniently described in photographic details in her affidavit, the Court will not consider plaintiff's eleventh-hour recollections. *Buckner v. Sam's Club, Inc.*, 75 F.3d 290 (7th Cir. 1996); *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F.Supp. 1424, 1430–31 (D.C.Ala.1996).[4]

4. Hernandez–Loring prefaces her affidavit with a disclaimer that "[t]he following statements in make under duress because I feel ashamed and outraged even to think about these incidents and much worse to have to verbalize them." (Docket # 53, Exhibit 1,

In view of Hernandez–Loring's uncorroborated, belated, and self-serving testimony, tailor-made to refute defendants' summary judgment motion, coupled with the fact that she did not raise any colorable claims of sexual misconduct or impropriety during her tenure review or appeal process, we can only consider her testimony as a collage of "conclusory allegations, improbable inferences, and unsupported speculation," *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d at 8, that are insufficient "to block summary judgment" against her. *J. Geils Band Employee Benefit Plan v. Smith Barney Inc.*, 76 F.3d 1245, 1251 (1st Cir.1996).

Even assuming arguendo, that we accepted Hernandez–Loring's account of Diaz–Rivera's alleged sexual improprieties towards her, plaintiff must still establish a colorable claim that her denial of tenure by the review committee was directly linked to Diaz–Rivera's need to quell his sexual revenge upon her. Having failed to establish any link between her denial of tenure and Diaz–Rivera's discriminatory animus toward her, we cannot find a "quid pro quo" violation.

Although the Supreme Court has recently held that there's no need to establish the "quo" in the "quid pro quo" prong of sexual harassment claims,[5] the Court is unable to discern any causal link between the merit-based objective performance. rendered by at least 4 of the 5 committee members, and her claim for retaliation/sexual harassment. (See footnote 3, supra) Even assuming, *arguendo*, that Diaz–Rivera's evaluation was indeed tainted by her contempt of Hernandez–Loring (motivated by plaintiff's objections to Diaz–Rivera's elevation to full professor, as well as her refusal to cater to his sexual whims), we cannot possibly ascribe Rasputin-like[6] qualities to this man, insofar as plaintiff alleges that Diaz–Rivera manipulated the entire committee to satisfy his own petty needs for revenge.

Even assuming, as we must, for purposes of this summary judgment motion, that Diaz–Rivera harbored such grievous resentment toward plaintiff, we cannot

---

Par. 16) Notwithstanding plaintiff's alleged emotional distress, she has not proffered any evidence that she was under any medication or that she was mentally incapacitated either at the time that she testified in the deposition or when she issued her affidavit. Having voluntarily withheld information at her deposition or produced information that is inconsistent with her previous deposition, the Court cannot accept her eleventh-hour proffer to buttress her sexual harassment allegations.

**5.** The term "quid pro quo" literally means "what for what", or "something for something." *Black's Law Dictionary* (West Publishing Co, 6th Ed.1990); *Random House Unabridged Dictionary* (Random House, N.Y. 1993). The Supreme Court recently noted in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) that an employee who refuses the unwelcome and threatening sexual advances of a supervisor, yet suffers no adverse, tangible job consequences, can recover against the employer, if she shows that the sexual advances were sufficiently severe or frequent to create a "hostile work environment." Furthermore, the Court explained that "when no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Such defense, added the Court "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 2270. *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Even if Hernandez–Loring's allegations had not been stricken off the record, the Court has serious doubts whether her allegations—which essentially comprise three incidents by two separate individuals during a five-year span, as well as a series of vague entreaties by Diaz–Rivera to date Hernandez–Loring—could have been considered of sufficient frequency and severity to establish a colorable claim of "hostile work environment" that would withstand summary judgment.

**6.** Refers to Grigori Efimovich Rasputin (1871–1916), a Siberian peasant monk who was very influential at the court of Czar Nicholas II and Czarina Alexandra. The term "Rasputin" is used to describe any person who exercises great but insidious influence.

conclude that his personal contempt tainted not only his evaluation, but also the evaluations of the entire review committee, as well as the concomitant appeal process of plaintiffs tenure petition. To adopt plaintiffs' allegations, we would have to infer a conspiracy of such massive proportions between Diaz–Rivera, Carmen Bigas, Marta Ramos, Nilda Lopez, Maria del C. Monserrat, Dean Rene Labarca and even Jose F. Mendez, the President of Fundacion Ana G. Mendez, that, to paraphrase the words of noted Supreme Court Justice Benjamin Cardozo, "life would have to be made over, and human nature transformed," before a circumstance so extravagant may occur. *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 343, 162 N.E. 99 (1929).

It is a sad state of affairs when personal vendettas between two extremely educated individuals lead to this litigation-riddled scenario. This case is ultimately a reminder that the law "does not prohibit everything that is intensely undesirable." *Bennis v. Michigan*, 516 U.S. 442, 116 S.Ct. 994, 1002, 134 L.Ed.2d 68 (1996) (Thomas, J. concurring). Our dismissal of the case today does not suggest that the Court sympathizes or condones Diaz–Rivera's and Rene Labarca's alleged conduct. This does not mean that Diaz–Rivera and Labarca have come out unscathed from this proceeding. On the contrary, Diaz–Rivera and Labarca have already paid a price, brought about by the filing of this lawsuit and the eleventh-hour description by plaintiff of Diaz–Rivera's alleged sexually predatory advances towards faculty and students alike and Labarca's alleged drunken foray.

In view of the above analysis, defendants' motion for summary judgment (**Docket # 52**) is hereby **GRANTED** and the present complaint is **DISMISSED**. Judgment shall issue accordingly.

**SO ORDERED.**