# United States Court of Appeals
## For the First Circuit

No. 99-2116

MARIA VIRGINIA HERNANDEZ-LORING, DR.,

Plaintiff, Appellant,

v.

UNIVERSIDAD METROPOLITANA; RENE LABARCA, CHANCELLOR OF
UNIVERSIDAD METROPOLITANA; LUIS R. DIAZ-RIVERA, PRESIDENT OF
COMMITTEE FOR EVALUATION OF RANK; CARMEN BIGAS, MEMBER OF
COMMITTEE FOR EVALUATION OF RANK; MARTHA RAMOS, MEMBER OF
COMMITTEE FOR EVALUATION OF RANK; NILDA LOPEZ, MEMBER OF
COMMITTEE FOR EVALUATION OF RANK; MARIA DEL C. MONSERRAT,
MEMBER OF COMMITTEE FOR EVALUATION OF RANK; SISTEMA
UNIVERSITARIO ANA G. MENDEZ (A PUERTO RICO NON-PROFIT
CORPORATION),

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Selya, Circuit Judge,

Wallace,[*] Senior Circuit Judge,

and Boudin, Circuit Judge.

Wilfredo A. Geigel for appellant.
Jose E. De La Cruz-Skerrett with whom De La Cruz Skerrett

---

[*]Of the Ninth Circuit, sitting by designation.

<u>Law Offices</u> was on brief for appellees.

December 1, 2000

BOUDIN, <u>Circuit Judge</u>.  In 1973 Dr. Maria Virginia Hernandez-Loring was first employed as a teacher in the Ana G. Mendez University System, a group of private institutions of higher learning in Puerto Rico.  In 1981, after receiving her Ph.D. in education, she became an instructor at Universidad Metropolitana, one of the units in the system.  She was promoted to auxiliary professor in 1983 and associate professor in 1988. However, in February 1995, a five-member academic committee declined to recommend Hernandez-Loring for promotion to full professor.  In February 1997 she brought the present action in the federal district court in Puerto Rico based on diversity jurisdiction, Hernandez-Loring by then having moved to Virginia to live with her husband.

In the first of two counts, the complaint charged that the denial of promotion constituted a denial of due process for a number of reasons (<u>e.g.</u>, because the committee members were not competent in Hernandez-Loring's field of applied linguistics).  The second count charged sexual harassment; it said that the head of the committee--Dr. Luis R. Diaz-Rivera-- had harassed her and that her denial of promotion occurred

because "she refused to date him."  The named defendants were Universidad Metropolitana, its chancellor Rene Labarca, all five members of the committee that had refused to recommend Hernandez-Loring's promotion, and the university system of which Universidad Metropolitana is a part.

After a good deal of discovery including the deposition of Hernandez-Loring, the defendants moved for summary judgment. In opposition, Hernandez-Loring offered an affidavit expanding on her deposition testimony.  On August 20, 1999, the district court granted the motion for summary judgment and dismissed the complaint. Hernandez-Loring v. Universidad Metropolitana, 62 F. Supp. 2d 450, 463 (D.P.R. 1999).  The court's reasoning, discussed below, was different as to each of the three claims-- the due process claim (count I) and what the court took to be distinct claims for quid pro quo and hostile environment sexual

harassment (count II).[1]  Hernandez-Loring has now appealed to this court.

In general, the grant of summary judgment is reviewed <u>de novo</u>, reasonable doubts and issues of credibility being resolved in favor of the non-moving party.  <u>Landrau-Romero</u> v. <u>Banco Popular de Puerto Rico</u>, 212 F.3d 607, 611 (1st Cir. 2000). At the threshold, Hernandez-Loring argues that the district court should be reversed because the summary judgment motion was filed after the original deadline fixed by the court's scheduling order.  However, such an order may be modified for "good cause," Fed. R. Civ. P. 16(b), and the district court's finding of good cause, based on Hernandez-Loring's own discovery delays, was not an abuse of discretion.

Turning to the grant of summary judgment on count I, we readily affirm the district court.  In making academic appointments or promotions, a private university is not directly

---

[1]It is not at all clear from the complaint that Hernandez-Loring intended to state a separate sexual  harassment claim or whether references in the complaint were solely in support of the due process claim.  However, during the summary judgment proceedings before the district court, both parties treated the case as if there were a separate claim for sexual harassment, devoting a substantial portion of their summary judgment memoranda to that issue, and the district court proceeded on the same basis. Accordingly, we treat the complaint as effectively amended or clarified by consent.  <u>See</u> Fed. R. Civ. P. 15(b); <u>Rodriguez</u> v. <u>Doral Mortgage Corp.</u>, 57 F.3d 1168, 1172 (1st Cir. 1995).

governed by the due process requirements of the Fifth and Fourteenth Amendments. See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999). Still, Puerto Rico law apparently regards private-university tenure decisions as subject to an implicit contractual constraint that the university will follow its own regulations. This is the holding of Selosse v. Fundacion Educativa Ana G. Mendez, 122 D.P.R. 534, 545-51 (P.R. 1988), a case that resulted from a suit by a different teacher for denial of tenure by the same university system involved in the present case.

Hernandez-Loring does not allege a violation of any specific university promotion regulation. Instead, she criticizes inter alia the failure to include on the committee persons who shared her own specialty, the scoring system used (she placed fourth out of four candidates for one promotion), the vagueness of the standards employed in the promotion process, the disregard of her published work insofar as it was for pay, the inadequacy of the appeals process, and the choice as head of the committee of a man (Diaz-Rivera) whose promotion to the university administration Professor Hernandez-Loring had previously opposed.

Academic promotion disputes, as the district court noted, often pit concerns about fair procedure against the

-5-

autonomy of universities; but in this case there is no balancing to be done nor any basis for considering whether the processes employed were "fair." There is no constitutional claim asserted, no contract claim beyond the right to have regulations followed, and no asserted violation of any specific regulation. Nothing in Hernandez-Loring's argument indicates that something else is required by Puerto Rico law. Perhaps Puerto Rico law offers more and, if so, future litigants are welcome to make that showing.

The second claim--that of quid pro quo harassment--is far more difficult to assess. The district court assumed (perhaps wrongly) that Hernandez-Loring was invoking Title VII, 42 U.S.C. § 2000e-2(a)(1) (1994).[2] On appeal, Hernandez-Loring has cited only Puerto Rico statutory law, including the ban on sexual harassment. 29 P.R. Laws Ann. § 155b (1995). Nevertheless, the substantive law of Puerto Rico on sexual harassment appears to be aligned, so far as pertinent here, with Title VII law, and Title VII precedents are used freely in construing Commonwealth law. Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 854 (1st Cir. 1998).

---

[2]There is no indication that the administrative preconditions for a Title VII suit were ever satisfied. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).

-6-

Under Title VII, quid pro quo sexual harassment can be shown where a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands.  Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999); Lipsett v. University of Puerto Rico, 864 F.2d 881, 897 (1st Cir. 1988). The gist of Hernandez-Loring's quid pro quo claim here is that Diaz-Rivera made advances to her, was rebuffed, and then used his position as head of the committee to revenge himself by blocking her promotion.  The district court assumed that such a claim would be legally viable but ruled that Hernandez-Loring had not offered credible evidence sufficient to withstand a motion for summary judgment against her.

During her deposition, Hernandez-Loring offered general allegations, but when pressed for specifics, became  vague, said she did not recollect, or simply repeated her general assertions.  Later, in her affidavit prepared in response to defendants' summary judgment motion, she furnished details, quotations, and in one case a wholly new incident that had not been offered in her deposition.  The district court declined to consider these "eleventh hour recollections." Hernandez-Loring, 62 F. Supp. 2d at 461.  We will have more to say about this issue but think it clearer to explain first what appeared in the

-7-

deposition pertinent to the quid pro quo claim and what was added thereafter.

In the deposition, Hernandez-Loring said that Diaz-Rivera had repeatedly used foul and salacious language in the classroom, that she had complained to the university chancellor or others on a number of occasions, that Diaz-Rivera had interrupted her own classes to request dates with her and pressed his requests on other occasions, that he had greeted her in the hallways with the phrase, "Listen, you haven't greeted me today, did I sleep with you last night," that although married he had carried on with students, and that at a faculty workshop in August 1995 after she had been denied promotion, the following occurred:

> Q. What did [Dr. Diaz's] remark consist of?
>
> A. Dr. Diaz told me that if I had done other things the results of my evaluation would have been different.
>     . . .
> Q. What other words did he use?
>     . . .
> A. "That [if] you had gone out with me you would have... - something like that - like going to bed with me, we would have had another... another result."

When Hernandez-Loring filed her affidavit, she was far more explicit about specific coarse and sexually explicit and suggestive language used by Diaz-Rivera toward his students and to Hernandez-Loring herself. Further, in describing what Diaz-

-8-

Rivera allegedly said to her at the faculty workshop in August 1995, Hernandez-Loring's affidavit discarded paraphrase; Diaz-Rivera, according to the affidavit, said: "Maria Virginia, this happened to you for being such a bitch . . . and [for] not [being] willing to go out with me." Finally, Hernandez-Loring alleged for the first time that in July 1995 she had been pawed, and lasciviously addressed, by the chancellor (Labarca), at a faculty lunch while the latter was inebriated.

In rejecting the quid pro quo claim, the district court gave two different reasons for granting summary judgment. First, the court ruled that the affidavit should not be considered because it did not square with Hernandez-Loring's earlier deposition testimony. And, second, the court said that even if it accepted the affidavit's more detailed description of Diaz-Rivera's conduct, "plaintiff must still establish a colorable claim that her denial of tenure by the review committee was directly linked to" retaliation by Diaz-Rivera, but that she had "failed to establish any link between her denial of tenure and Diaz-Rivera's discriminatory animus toward her." Hernandez-Loring, 62 F. Supp. 2d at 462. Even if Diaz-Rivera's vote was tainted, the court said that it was "unable to discern any causal link" between his animus and "the merit-based

objective performance rendered by at least 4 of the 5 committee members."  Id.

On appeal, Hernandez-Loring says that the court erred in refusing to consider the affidavit, but as to the quid pro quo claim, the affidavit is largely beside the point. Hernandez-Loring's deposition testimony already said that Diaz-Rivera pestered her for dates, made explicit sexual references, and then--after the committee he headed recommended against her promotion--more or less said to her in August 1995 that this was the consequence of her spurning him.  Deposition statements of students also corroborated Diaz-Rivera's use of suggestive language.  The affidavit added little to Hernandez-Loring's claim that her promotion denial was an act of spite by Diaz-Rivera.

Turning to causation, at first blush it seems unlikely that the private animus of one committee member, even though the presiding member, would be the effective cause of a decision by a committee of five members to rank Hernandez-Loring last among four candidates, giving her a numerical score below the minimum necessary to qualify for promotion to full professor (even if there had been more than one vacancy available). Cf. Coogan v. Smyers, 134 F.3d 479, 485 (2d Cir. 1998); Jeffries v. Harleston, 52 F.3d 9, 14 (2d Cir.), cert. denied, 516 U.S. 862 (1995).  On

-10-

the other hand, it is not impossible: conceivably a biased chair could have influenced other members privately or, depending on how the score was developed, a very low score from one member could have had a disproportionate result.  The briefs are remarkably opaque as to how the committee operated and how it reached its decision.

For the most part, this opacity argues against Hernandez-Loring.  Faced with a motion for summary judgment, it was her burden to establish that there existed evidence creating a trial-worthy claim that Diaz-Rivera had caused her to be denied the promotion.  Fed. R. Civ. P. 56(e); <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  In deposing the committee members, she was free to ask questions to establish what was said at the deliberations, to identify so far as possible how the scoring was done, and to identify what Diaz-Rivera might have done to influence the outcome adversely to her promotion.  Of course, objections might have been raised to such inquiries.

Yet she has one very potent fact in her favor. According to her deposition testimony, Diaz-Rivera himself boasted to her that he had caused her denial of promotion because she had spurned him.  True, he did not explain how this trick had been done and his statement could have been

-11-

misunderstood or, alternatively, it could have been a cruel deceit to make a denial of promotion on the merits even more painful. But an admission from a wrongdoer is powerful proof even without detail, see Hallquist v. Local 276, Plumbers & Pipefitters Union, 843 F.2d 18, 24-25 (1st Cir. 1988), and how his statement should be construed and whether it should be accepted as true are largely jury issues, at least where the admission is not wholly incredible. Anderson, 477 U.S. at 255.

There is no evidence, apart from Hernandez-Loring's own testimony, that Diaz-Rivera ever made the critical admission. This is a troubling problem often prominent in harassment cases and accentuated here by the surface unlikelihood of the causation claim. On the other hand, Hernandez-Loring was consistent in her claim that Diaz-Rivera made his boast; most (although not all) of the other changes in her testimony are less suspicious than they look (as we will shortly explain); and the likelihood that the boast was made is somewhat enhanced, even if indirectly, by the evidence from the students as to how Diaz-Rivera generally behaved. In sum, we think summary judgment on the quid pro quo claim should not have been granted on the grounds given.

On remand, nothing prevents the defense, if the district court permits it, from making a second motion on this

issue.  If the four committee members told a consistent story that effectively disproved Diaz-Rivera's boast,  it is not clear that a reasonable jury could accept the boast; nor would Hernandez-Loring automatically be entitled to a trial simply in the hope that the jury might disbelieve consistent, plausible, and otherwise unimpeached testimony from four other witnesses, even if (dubitante) they were technically "interested" parties. See Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992).

Finally,  we  consider  the  claim  that  there  was sufficient evidence of a "hostile work environment" to entitle Hernandez-Loring to a trial on that claim.  Here, the district court thought it fatal that much of the force of this claim rested on allegations that appeared only in Hernandez-Loring's affidavit and not in her deposition.  In the alternative, the court said that even if the affidavit were accepted, the court doubted whether the allegations--which it said "essentially comprise three incidents by two separate individuals during a five-year span, as well as a series of vague entreaties by Diaz-Rivera to date Hernandez-Loring"--were of "sufficient frequency and severity" to make out a colorable claim of hostile work environment.  Hernandez-Loring, 62 F. Supp. 2d at 462 n.5.

Whether (or to what extent) the affidavit had to be considered is a difficult question. We have said in the past that where a party has given "clear answers to unambiguous questions" in discovery, that party cannot "create a conflict and resist summary judgment with an affidavit that is clearly contradictory," unless there is a "satisfactory explanation of why the testimony [has] changed."[3] Partly, the concern is with the credibility of a later disavowal, but the rule is also a matter of policy: if prior statements under oath could be disavowed at will after a motion is made, the other side would be faced with a constantly moving target and summary dispositions made almost impossible.

Of course, in applying this rule, it is critical that there be no "satisfactory explanation" since lapse of memory, new sources of information or other events can often explain a revision of testimony. Whether there is a contradiction and whether the explanation for it is satisfactory are both likely to depend very much on an assessment of specific facts; and in such cases the district court's judgment is likely to be superior to that of a more remote appellate tribunal. Usually

---

[3]Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994); accord Torres v. E.I. DuPont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000); see also Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995).

appellate courts give some deference to the district court's assessment of so-called "mixed questions." <u>United States</u> v. <u>Howard</u> (<u>In re</u> <u>Extradition of Howard</u>), 996 F.2d 1320, 1327-28 (1st Cir. 1993).  Deference, however, does not mean abdication, and here our view of the situation differs somewhat from that of the district court.

We think that in the present case the district court was entitled to disregard any completely new incident that Hernandez-Loring described for the first time in her affidavit, assuming that prior questions had clearly asked for such information.  This may be the case with Hernandez-Loring's claim that in July 1995 she was pawed and subjected to suggestive comments by the chancellor.  She was asked in general terms about incidents of harassment and this was a prime candidate: it was close in time to the deposition and it could have been adverted to without grave embarrassment by paraphrasing the alleged remarks.

On the other hand, the other two specific incidents identified by date in Hernandez-Loring's affidavit were both cited in her deposition testimony:  the first was an offensive overture by Diaz-Rivera, probably at a Thanksgiving luncheon in November 1991; the other was the August 1995 claim by Diaz-Rivera that he had blocked her promotion in retaliation for her

resistance. In the first case, Hernandez-Loring supplied precise offensive language only in her affidavit, while in the second, the language offered in the affidavit was stronger only by degree than the softer paraphrase in the deposition. In neither case is there a real contradiction between deposition and affidavit; and, as for explanation for the changes, the deposition colloquies make clear, and the preface to the affidavit makes explicit, Hernandez-Loring's extreme discomfort and reluctance to repeat the offensive language allegedly used in the various incidents.

Of course, plaintiffs who bring sexual harassment suits have to be prepared to repeat in timely fashion the offensive language at issue, painful though it may be. Certainly the plaintiff's initial reluctance to remember, and her later offer of detail, could be considered in assessing her testimony. But in our view it would be an abuse of discretion in the present case to disregard the affidavit as to the two incidents previously identified in the deposition where the only difference between deposition and affidavit was the affidavit's provision of more specific language allegedly used by Diaz-Rivera.

This brings us to the district court's alternative objection. If the two incidents just mentioned stood alone, it

-16-

is not easy to see how Hernandez-Loring could make out much of a hostile environment claim. The first incident allegedly occurred in November 1991. While the remarks were highly offensive, it appears that Hernandez-Loring did not work for Diaz-Rivera, never reported the incident, and continued to work at the university until her January 1997 departure, which (whether occasioned by marriage or the denial of promotion) seemingly had little connection with a very brief event five years before. As for Diaz-Rivera's alleged boast in August 1995, it is highly relevant to a claim of quid pro quo harassment, but tamer (although not irrelevant) than the usual basis for a hostile environment claim.

However, the two alleged incidents are only the most specific of the events that underlie the claim of a hostile environment. Without being specific as to dates, Hernandez-Loring said that Diaz-Rivera had repeatedly asked her for dates and used suggestive language toward her; that he had interrupted her class to do so; that she had been offended and upset by this pattern of conduct; that Diaz-Rivera was known to have used suggestive and offensive language to students in class (a charge backed up by several student affidavits and depositions);[4] and

_____

[4]Evidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment. Lipsett, 864 F.2d at 886, 888; accord Allen v. Tyson Foods,

-17-

that on various occasions she (Hernandez-Loring) had complained about Diaz-Rivera's conduct to the chancellor and others.

No precise formula determines what constitutes a hostile environment. Under Title VII precedents, which we assume to be followed in construing Puerto Rico law, see Rodriguez-Hernandez, 132 F.3d at 854, the conduct must go beyond the "merely offensive" and approach tangible injury (including psychological injury); and factors to be considered include frequency, severity, whether the conduct is "physically threatening or humiliating," and whether it "unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993). While it is easy to find more grievous episodes of harassment, there are also cases in which conduct no worse than that described by Hernandez-Loring has been held sufficient to justify a finding of hostile environment.[5]

Accordingly, we cannot sustain the dismissal of the hostile environment claim upon the only grounds provided by the

Inc., 121 F.3d 642, 647 (11th Cir. 1997); Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1522-23 (M.D. Fla. 1991); 1 Lindemann & Grossman, Employment Discrimination Law 793 (3d ed. 1996).

[5]E.g., Hutchison v. Amateur Elec. Supply Inc., 42 F.3d 1037, 1041-43 (7th Cir. 1994); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1461-63 (9th Cir. 1994), cert. denied, 513 U.S. 1082 (1995); see also Harris, 510 U.S. at 19-20.

district court. It is a different matter whether this claim might on some other basis be resolved in defendants' favor short of trial; in particular, it is far from clear what claim Hernandez-Loring has under count II against the other four committee members. Further, the timing of Hernandez-Loring's resignation casts doubt on any suggestion of constructive discharge. Still, the possibility that Hernandez-Loring left for reasons other than harassment does not necessarily preclude narrower damage claims--if damages can be shown--for events within the applicable statute of limitations.

For the reasons stated, the grant of summary judgment on count I is <u>affirmed</u>; the grant of summary judgment on count II is <u>vacated</u> and that count is <u>remanded</u> for further proceedings consistent with this opinion. Each side shall bear its own costs.

<u>It is so ordered.</u>