Gwyn et al. v. Loon Mountain          CV-01-214-B    05/15/02
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


Eileen Gwyn, as Executor of
the Estate of Howard Gwyn,
Eileen Gwyn, on her own behalf,
and Margaret Do

     v.                              Civil No. 01-00214-B
                                     Opinion No. 2002 DNH 100
Loon Mountain Corporation
d/b/a Loon Mountain Ski Area



                    MEMORANDUM AND ORDER

     This diversity case arises out of a tragic skiing accident

that resulted in two fatalities.  In their first amended

complaint, plaintiffs Eileen Gwyn (individually and on behalf of

her late husband's estate) and Margaret Do (Gwyn's daughter) seek

to hold defendant Loon Mountain Corporation liable for damages

they suffered as a result of the accident.  Presently pending are

two motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) filed

by defendant, as well as a motion for leave to amend the first

amended complaint and a motion for leave to reply to defendant's

objection thereto filed by plaintiffs.  For the reasons that

follow, I grant in part and deny in part one of defendant's

motions to dismiss, grant the second motion to dismiss, grant plaintiffs' motion for leave to reply to defendant's objection to the motion for leave to amend, but deny plaintiffs' motion for leave to amend.

I.

In addressing defendant's Rule 12(b)(6) motions, I accept all the factual allegations in the first amended complaint and draw all reasonable inferences from those allegations in plaintiffs' favor.  See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).

On January 25, 1999, Howard and Eileen Gwyn; their daughter, Margaret Do; and their daughter's fiancé, Mark Goss, were skiing at Loon Mountain Ski Area in Lincoln, New Hampshire.  At about 11:15 a.m., Howard Gwyn, Do, and Goss rode the chairlift to the top of the Big Dipper ski trail, while Eileen Gwyn remained at the base of the mountain.  The four planned to meet for lunch at 11:30 a.m. at the Governor Adams Base Lodge.

After exiting the chair lift, Howard Gwyn (an expert skier), Do, and Goss skied down the upper part of the Big Dipper trail to the area where it adjoins the Triple Trouble trail.  The Triple

-2-

Trouble trail was closed at the time. Gwyn, skiing in control and with due care, was the first to approach the junction of the two trails. As Gwyn reached the area adjacent to the junction, he attempted to stop. Unbeknownst to him, the area was covered by ice. Gwyn fell and began to slide. Loon had placed a single rope across the pathway by which skiers access the Triple Trouble trail from the Big Dipper trail, but Gwyn slid beneath the rope and some 900 additional feet down the mountain.

Do and Goss witnessed Gwyn's involuntary slide under the rope and unintended entry onto the Triple Trouble trail. Recognizing the seriousness of the situation, Do and Goss removed their skis, placed them near the intersection of the two trails, and attempted to rescue Gwyn by walking down the slope towards him. But Do and Goss both slipped and plummeted down the icy trail as well.

Eileen Gwyn became concerned when her family did not arrive for lunch at the agreed-upon time. At some point between 12:15 p.m. and 12:30 p.m., Gwyn approached a Loon employee at an information booth or ski school area inside the lodge, told the employee that her family was unusually late, and asked if the

employee had heard about any skiers being injured. The employee replied that she had not heard about any injured skiers and that Gwyn should not worry. At approximately 1:00 p.m., Gwyn approached the same employee, expressed concern about the safety of her family, and stated that she needed help finding them. The employee told Gwyn not to worry and took no further action. At approximately 1:50 p.m., Gwyn approached the employee yet again, stated that her family had been missing since 11:30 a.m., and informed the employee that she needed help in locating them. The employee replied that she did not have a phone and that there was nothing she could do to help.

At approximately 2:50 p.m., Gwyn pleaded with the employee for help in finding her family. The employee responded by telling Gwyn that she could check the first aid station, which was approximately one-half mile away. The employee did not offer to use a telephone to call for help. At approximately 3:50 p.m., as the ski area was beginning to shut down, Gwyn approached the employee and again begged for help. The employee once again replied that she could not assist Gwyn and that Gwyn should "go see one of the guys in the black and red jackets" – i.e., the ski patrol. Gwyn subsequently located a ski patrol member and

-4-

informed him that her family had been missing since 11:30 a.m. The ski patrol member called the first aid station.

At approximately 4:10 p.m., the Loon ski patrol discovered the skis Do and Goss had left near the intersection of the Triple Trouble and Big Dipper trails. Shortly thereafter, the patrol discovered Howard Gwyn, Do, and Goss. Howard Gwyn was badly injured and unconscious; Do was badly injured and frostbitten; and Goss was dead. The ski patrol transported the three skiers by stokes litter to the base of the mountain. Eileen Gwyn experienced near hysteria at the shock of seeing her husband and daughter bloodied and near death. Do survived her injuries, but required extensive medical treatment and therapy. Howard Gwyn died from his injuries two days after the accident.

In January 2001, plaintiffs initiated this action in Grafton County Superior Court. Defendant removed the case to this court on the basis of diversity jurisdiction, and plaintiffs subsequently filed a first amended complaint. The first amended complaint sets forth five causes of action. Count I asserts that plaintiffs were injured by defendant's failure to maintain certain signs and designations allegedly required by N.H. Rev.

tat. Ann. § 225-A:23;[1] Count II, which sounds in negligence,

asserts that plaintiffs were injured by defendant's breach of a

number of duties owed to plaintiffs because their fulfillment is

---

[1]Count I asserts that defendant (1) "failed to provide critically important information . . . on a trail board at the base of the mountain pursuant to RSA 225-A:23 to indicate that the Triple Trouble Trail and its access points were closed, dangerous, extra hazardous, or potentially life threatening"; (2) "failed to mark the beginning of each ski trail or slope with the appropriate symbol for that particular trail's or slope's degree of difficulty pursuant to RSA 225-A:23 to warn . . . of the dangerous, extra hazardous, and life threatening conditions leading up to and on the Triple Trouble Trail"; and (3) "failed to mark the beginning of, and designated access points to, the Triple Trouble Trail with a closed sign pursuant to RSA 225-A:23 to warn . . . of the dangerous, extra hazardous, and potentially life threatening conditions then existing."

As detailed infra, N.H. Rev. Stat. Ann. § 225-A:23 does require ski areas to post certain information on their trail boards and at the beginnings of their ski trails and slopes.  The statute also obliges ski areas to notify skiers, at the beginnings of their ski trails and slopes and at designated access points, if a trail is closed.  But as defendant points out, the statute does not require ski areas to warn skiers if their trails or slopes are dangerous, extra hazardous, and/or potentially life threatening.  Mindful that I am evaluating a Fed. R. Civ. P. 12(b)(6) motion, I will disregard these surplus allegations and construe Count I as alleging that defendant failed to fulfill its statutory obligations to post certain signs and designations on its trail board, at the beginning of the Big Dipper and Triple Trouble trails, and at the access point to the Triple Trouble trail where the falls underlying this lawsuit took place.  Of course, if I am construing the vaguely worded Count I too generously, defendant may challenge the statutory claims which survive its motion to dismiss, see infra, in a properly supported motion for summary judgment.

-6-

essential to the safe operation of a ski area and/or because defendant "voluntarily assumed" them and thus obliged itself to perform them with due care under the principle set forth in Restatement (Second) of Torts § 323 (endorsing recovery, in certain circumstances, for persons victimized by another's negligent performance of an undertaking to render services) ("negligent performance of an undertaking doctrine"); Count III asserts that plaintiffs were injured by defendant's negligent infliction of emotional distress; Count IV asserts that plaintiffs were injured by defendant's knowing and willful violation of the New Hampshire Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. § 358-A, in the course of advertising and marketing itself as a safe ski area; and Count V asserts that defendant is liable to plaintiffs under the doctrine of respondeat superior.

## II.

As noted above, defendant has filed two motions to dismiss. The first motion seeks dismissal of Counts I-III, and V as precluded as a matter of law by the New Hampshire's Skiers, Ski Area, and Passenger Tramway Safety Act ("Ski Statute"), N.H. Rev.

-7-

Stat. Ann. § 225-A.  The second motion seeks dismissal of Count IV for failure to state a viable cause of action.  Plaintiffs have filed objections to these motions.  Plaintiffs also have moved for leave to amend their first amended complaint and to reply to defendant's objection to their motion for leave to amend.

## A.    Motion to Dismiss Based on the Ski Statute

Defendant argues that the allegations in Counts I and II do not state claims under which relief can be granted because (1) the Ski Statute specifies the few duties defendant owed to plaintiffs; (2) the Ski Statute immunizes defendant from liability for injuries caused by the inherent risks, dangers, or hazards of skiing; and (3) plaintiffs' allegations make clear that their injuries were not caused by defendant's violation of a statutory duty, but by the inherent risks, dangers, or hazards of skiing.  Defendant further asserts that Counts III and V fail to state claims on which relief can be granted because they are derivative of Counts I and II.  Finally, defendant presses an alternative argument that, irrespective of its other deficiencies, Count III is inadequately pleaded.  I largely, but not entirely, agree with these arguments.

-8-

1.  <u>Counts I and II</u>

Defendant's first argument is built upon an accurate depiction of New Hampshire law.  In its first section, titled "Declaration of Policy," the Ski Statute states:

> [I]t shall be the policy of the state of New Hampshire to define the primary areas of responsibility of skiers and other private users of alpine (downhill) and nordic (cross country and ski jumps) areas, recognizing that the sport of skiing and other ski area activities involve risks and hazards which must be assumed as a matter of law by those engaging in such activities, regardless of all safety measures taken by the ski area operators.

N.H. Rev. Stat. Ann. § 225-A:1.  To this end, the legislature has specified the responsibilities of ski area operators in N.H. Rev. Stat. Ann. § 225-A:23, and the responsibilities of skiers and passengers on ski area tramways in N.H. Rev. Stat. Ann. § 225-A:24.

In relevant part, N.H. Rev. Stat. Ann. § 225-A:23 requires ski area operators (1) to mark the beginning of each ski trail or slope with a designated symbol designed to notify skiers of the degree of difficulty of the trail or slope, <u>see</u> N.H. Rev. Stat. Ann. § 225-A:23, I(a)-(d), III(a); (2) to mark the beginning of, and designated access points to, each alpine trail that is closed

with a designated symbol notifying skiers of the closure, N.H. Rev. Stat. Ann. § 225-A:23, I(e), III(b); and (3) to maintain a base area trail board which lists the area's network of ski trails and slopes, notifies skiers of the degree of difficulty of each trail or slope through use of the aforementioned symbols, and notifies skiers which trails or slopes are closed through use of a designated symbol, see N.H. Rev. Stat. Ann. § 225-A:23, I(a)-(e), II(a). The relevant portion of N.H. Rev. Stat. Ann. § 225-A:24 states:

> It is hereby recognized that, regardless of all safety measures which may be taken by the ski area operator, skiing as a sport and the use of passenger tramways associated therewith may be hazardous to the skiers or passengers. Therefore . . . [e]ach person who participates in the sport of skiing accepts as a matter of law[] the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries which result from such inherent risks, dangers, or hazards. The categories of such risks, hazards or dangers which the skier or passenger assumes as a matter of law include but are not limited to the following: variations in terrain, surface or subsurface snow or ice conditions; bare spots; rock, trees, stumps and other forms of forest growth or debris; lift towers and components thereof (all of the foregoing whether above or below snow surface); pole lines and plainly marked or visible snow making equipment; collisions with other skiers or other persons or with any of the categories included in this paragraph.

N.H. Rev. Stat. Ann. § 225-A:24, I.

The New Hampshire Supreme Court has interpreted the interplay of these provisions as codifying the primary assumption of the risk doctrine with respect to the inherent risks of skiing. See Rayeski v. Gunstock Area/Gunstock Area Comm'n, 776 A.2d 1265, 1268 (N.H. 2001); Nutbrown v. Mount Cranmore, Inc., 140 N.H. 675, 680 (1996). As applied in this context, the doctrine relieves ski area operators from any duty to protect skiers from the inherent risks of skiing. See Nutbrown, 140 N.H. at 680 ("To the extent that a skier's injury is caused by an inherent risk of skiing, the skier may not recover from the ski area operator."). But the doctrine does not relieve ski area operators of liability for injuries caused by a violation of their statutory duties under N.H. Rev. Stat. Ann. § 225-A:23. See Nutbrown, 140 N.H. at 683 (regarding as viable the plaintiff's claim that his injuries were caused by the defendant's failure to mark properly the beginning of the trail on which he was injured).

By virtue of N.H. Rev. Stat. Ann. 225-A:24, I, Howard Gwyn's, Do's, and Goss's encounters with ice near the intersection of the Big Dipper and Triple Trouble trails were, as

a matter of law, legally assumed risks, dangers, or hazards inherent in the sport of skiing. See id. (identifying accidents caused by "surface or subsurface snow or ice conditions" as "risks, hazards or dangers" which the skier assumes as a matter of law). So too were their subsequent slides down the ice-covered Triple Trouble trail. See id.[2] Consequently, because these events were clearly causative (at least factually) of plaintiffs' injuries, defendant is entitled to dismissal of plaintiffs' claims unless plaintiffs can identify some act or omission of defendant that both could have been an additional factual cause of the skiers' injuries and is outside the scope of conduct immunized from liability under the New Hampshire Supreme Court's construction of N.H. Rev. Stat. Ann. § 225-A.

I start with plaintiffs' negligence theories. Plaintiffs' primary argument is that injuries caused by an inherent risk of skiing can also be caused by ski area operator carelessness, and

_____

[2]Plaintiffs argue that one cannot assume a risk of which s/he is unaware, and that Howard Gwyn was unaware of the dangerous patch of hidden ice which led to his fall. Plaintiffs also make the closely related argument that encountering hidden dangers is not an inherent risk of skiing. These arguments fail because the statute effectively charged Gwyn with knowledge that, while skiing, he might encounter a dangerous and hidden, indeed life-threatening, patch of ice which could cause him to fall.

-12-

that the acts and omissions identified in Count II as having played a causal role in plaintiffs' injuries – defendant's failure to warn against, ameliorate, and/or close the icy area where Howard Gwyn and Do slipped and fell and subsequent failure to rescue the injured skiers in a timely manner – are actionable at common law notwithstanding the Ski Statute.  There is ambiguous language in Nutbrown which, when read out of context, can be construed to support this argument by negative implication.  See 140 N.H. at 680 ("An injury entirely caused by an inherent risk of skiing is not actionable.") (emphasis supplied); see also id. (generally acknowledging that the Ski Statute does not bar actions based on "injuries caused by the [ski area] operator's own negligent or intentional acts").  But last year's Rayeski opinion forecloses this argument:

> We also reject the plaintiff's argument that his claim falls within the category of "injuries caused by the [ski area] operator's own negligent or intentional acts" that we noted in Nutbrown were not barred by [the Ski Statute] . . . .  The categories of injuries caused by an inherent risk of skiing and injuries caused by negligence are mutually exclusive . . . .  [A]n injury caused by an inherent risk cannot have been negligently caused because there is no duty to protect against such risks.  Having determined that the plaintiff's injuries were caused by an inherent risk of skiing, we necessarily conclude that they were not caused by the defendant's negligence.

-13-

776 A.2d at 1269-70.  This passage can only mean that, irrespective of its knowledge of dangerous conditions and/or ability to take prophylactic measures, a ski area operator does not owe skiers a common law duty to protect them from injuries sustained as a result of hitting ice on a trail or slope, which the New Hampshire legislature views as an inherent risk of skiing.  See N.H. Rev. Stat. Ann. 225-A:24, I. The Ski Statute thus immunizes the acts and omissions complained of in Count II from liability under traditional negligence principles.

Plaintiffs have a fallback position.  Relying on the negligent performance of an undertaking doctrine set forth in Restatement (Second) of Torts § 323, plaintiffs contend that, because defendant voluntarily undertook a number of safety-related initiatives beyond those required by statute,[3] it made

_____

[3]In its Objection to Defendant's Motion to Dismiss First Amended Complaint Based on Ski Statute, plaintiffs specify the following as voluntary undertakings giving rise to liability under § 323:  defendant's failure to locate a rope closing off the Triple Trouble trail at a safe enough distance to avoid the harm that occurred; defendant's failure to assess the need for safety measures; and defendant's failure to adequately close off the icy area where the accident occurred by "using standard safety devices used by a reasonably prudent ski operation" – e.g., fencing, netting, and "slide for life" warnings.  Id. at 20.

-14-

itself liable for any harm that it caused in negligently performing the undertakings. In <u>Rayeski</u>, the New Hampshire Supreme Court declined to say whether the negligent performance of an undertaking doctrine might give rise to liability where an injury might reasonably be thought to have been caused by both an inherent risk of skiing and a ski area operator's carelessness in performing some undertaking not required by the Ski Statute. <u>See</u> 776 A.2d at 1269 (rejecting plaintiff's so-called "voluntarily assumed duty" theory, drawn from <u>Restatement (Second) of Torts</u> § 323, on grounds of forfeiture). But if applicable at all in this context,[4] the doctrine would only apply where a plaintiff has pleaded facts sufficient to permit a reasonable inference that defendant's undertaking(s) either (a) increased the risk that plaintiff would suffer harm, or (b) caused the harm because of plaintiff's reliance upon defendant's undertaking(s). <u>See</u> <u>Restatement (Second) of Torts</u> § 323.

---

[4]Defendant makes a powerful argument that applying the doctrine in cases such as this would be bad public policy because it would give ski area operators an economic incentive not to engage in safety measures beyond those required by the Ski Statute.

Here, the first amended complaint is devoid of allegations suggesting that defendant's failure to exercise reasonable care to perform the identified undertakings, see supra note 3, created the icy area where the falls took place, exacerbated an already dangerous situation, caused Howard Gwyn and Do to enter an area they would not have entered absent the undertakings, or caused Howard Gwyn and Do to suffer worse injuries than they would have suffered absent the undertakings. In short, plaintiffs have provided me with no basis for inferring that defendant put plaintiffs in a worse position than they would have been in had defendant indulged its prerogative not to engage in any safety-related undertakings beyond those mandated in the Ski Statute. Consequently, the negligent performance of an undertaking doctrine does not supply plaintiffs with a viable negligence claim under Count II.

Much of Count I also lacks viability. Two of the omissions identified in Count I as giving rise to liability under N.H. Rev. Stat. Ann. § 225-A:23 (when stripped of their non-textual surplusage, see supra note 1) simply could not have caused plaintiffs' injuries. Even if defendant failed to mark the beginning of the Big Dipper trail with the designation

-16-

appropriate to the trail's degree of difficulty, there is no suggestion in the first amended complaint that Howard Gwyn, Do, or Goss was misled or induced to ski down a trail that was beyond his or her skiing competency.  And even if defendant failed to mark with an appropriate "closed" sign the beginning of the Triple Trouble trail, there is no suggestion that the absence of such a sign induced Howard Gwyn, and then Do and Goss, to enter the trail under the misapprehension that it was open.  Indeed, it is undisputed that Howard Gwyn inadvertently entered the Triple Trouble trail from the open Big Dipper trail, and that Do and Goss intentionally entered the Triple Trouble trail (which they knew to be closed and dangerous) in an unsuccessful attempt to assist Howard Gwyn.

Nonetheless, reading the first amended complaint in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, see Alternative Energy, Inc., 267 F.3d at 33, plaintiffs have stated two viable statutory claims.  If plaintiffs can establish that defendant failed to designate the Triple Trouble trail as closed on its base area trail board (as the first amended complaint can be generously construed to allege, see supra note 1) and that Howard Gwyn would have avoided

-17-

the icy area where he fell but for this statutory violation, a jury reasonably might conclude that the statutory violation caused his fatal injuries. Similarly, if plaintiffs can establish that defendant failed to place a closed sign on the Triple Trouble trail's designated access point from the Big Dipper trail, see supra note 1, and that Howard Gwyn would have approached the trail junction differently – e.g., less aggressively or at a different angle – but for this statutory violation, a jury reasonably might conclude that the statutory violation caused his fatal injuries. Thus, in these respects, the estate's direct statutory claim and Eileen Gwyn's and Do's derivative claims[5] survive defendant's motion to dismiss. But in

---

[5]Eileen Gwyn's Count I claim is derivative because she was not directly injured by defendant's alleged breach of its statutory duty with respect to the trail board. Rather, she is seeking damages caused by her lack of consortium with her late husband, whose fatal injuries were allegedly caused by defendant's breach of this duty. Do's statutory claim is also derivative because she does not, and cannot, claim that the absence of a closed sign on the trail board induced her to enter the icy area where she slipped. Instead, she claims that she entered the icy area where she slipped in order to attempt a rescue of her father.

In permitting Do to proceed on this "rescue doctrine" claim, I reject defendant's argument for dismissal thereof because Do did not plead the rescue doctrine as a theory of liability. For purposes of Fed. R. Civ. P. 12(b)(6), it is sufficient that the estate has a viable statutory claim and that

all other respects, I grant the motion to dismiss with respect to Counts I and II.

2. <u>Counts III and V</u>

As noted above, defendant's primary argument for dismissal of these counts is that they are derivative of Counts I and II – i.e., their viability depends necessarily on a finding that defendant breached some other statutory and/or common law duty to plaintiffs – and thus fail to the extent that Counts I and II lack viability. This argument is built from a sound premise and is persuasive as far as it goes; because plaintiffs rely on the same breaches of duties alleged in Counts I and II in framing Counts III (for negligent infliction of emotional distress) and V (for <u>respondeat</u> <u>superior</u>), Counts III and V cannot provide a

---

the pleaded facts support an award to Do under the doctrine. <u>See</u> <u>Blackstone Realty LLC v. FDIC</u>, 244 F.3d 193, 197 (1st Cir. 2001) (dismissal under Rule 12(b)(6) appropriate only if relief unobtainable under "any viable theory" suggested by the facts) (citation and internal quotation marks omitted); <u>cf.</u> <u>Connecticut</u> <u>General Life Ins. Co. v. Universal Ins. Co.</u>, 838 F.2d 612, 622 (1st Cir. 1988) (directing that a judgment be entered under a legal theory that was not pleaded but was implicated by the established facts of the case).

I also note that defendant has hinted at, but failed to develop, an argument that the New Hampshire Supreme Court would not apply the rescue doctrine under the circumstances of this case. I express no opinion on this issue, which has not been fully joined.

basis for recovery unless plaintiffs prevail on one or more of the theories advanced in Counts I and II.[6] As a result, defendant's potential liability is limited at the threshold to whatever emotional distress it might have negligently inflicted upon Eileen Gwyn or Do[7] in connection with the two viable breach of statutory duty theories identified in the previous section of this memorandum and order.

Settled New Hampshire law makes it clear that Eileen Gwyn, whose own claims under Counts I and II are derivative loss of consortium claims, see supra note 5, lacks a viable negligent infliction of emotional distress claim based on her exposure to the injuries suffered by her husband and daughter because she did not contemporaneously perceive the accidents giving rise to her

---

[6]In fact, Count V does not set forth a distinct cause of action at all; it merely contains an assertion that defendant is responsible for any duty-breaching acts or omissions of its agents, employees, and representatives. Defendant does not take issue with the merits of this proposition, so I will assume its correctness and say nothing more about Count V.

[7]Although Count III purports to state a negligent infliction of emotional distress claims on behalf of all plaintiffs, subsequent submissions make clear that only Eileen Gwyn and Do are seeking to state such a claim. See Plaintiffs' Objection to Defendant's Motion to Dismiss First Amended Complaint Based on Ski Statute, at 23; Plaintiffs' Motion for Leave to Amend Complaint, at 3.

family members' injuries.  See <u>Nutter v. Frisbie Memorial Hosp.</u>, 124 N.H. 791, 795-96 (1984); <u>see</u> <u>also</u> <u>Wilder v. City of Keene</u>, 131 N.H. 599, 603 (1989) ("we focus our analysis on whether the plaintiffs observed or perceived the accident when it occurred not on whether they observed or perceived the injuries their child sustained").  I therefore grant defendant's motion with respect to Eileen Gwyn's claim under Count III.  Do, on the other hand, has viable negligent infliction of emotional distress claims under Count III because she was allegedly both a victim of a breach of statutory duty (by operation of the rescue doctrine, <u>see</u> <u>supra</u> note 5) that might reasonably be thought to have caused her a painful mental experience with lasting physical effects, <u>see</u> <u>Thorpe v. State</u>, 133 N.H. 299, 303-04 (1990), and a contemporaneous perceiver of the others' accidents, which were allegedly caused by defendant's breach of a statutory duty and might reasonably be thought to have caused her a painful mental experience with lasting physical effects, <u>see</u> <u>Corso v. Merrill</u>, 119 N.H. 647, 657-58 (1979).[8]  I therefore deny defendant's

_____

[8]In so ruling, I reject defendant's alternative argument that Do's negligent infliction of emotional distress claim should be dismissed because plaintiffs have failed to allege that Do suffered physical manifestations of her emotional distress.  The

motion with respect to Do's Count III claims (to the extent that they are tied to the viable breach of statutory duty claims imbedded within Count I).

B. <u>Motion to Dismiss Count IV</u>

Defendant moves to dismiss Count IV, which sets forth a claim that defendant

> knowingly and willfully violated [the New Hampshire CPA] by explicitly and impliedly representing that its goods or services had sponsorship approval, characteristics, uses, benefits, or qualities that they did not have. In particular, Defendant represented that its ski slopes and trails would be safe for non-threatening skiing on its open slopes, that skiers would be properly warned of unexpected, dangerous extra hazardous, or life threatening trails, that dangerous, life threatening trails would be adequately closed off and monitored, and that ski operations including operations to find missing skiers would be implemented in a timely, adequate and safe fashion.

First Amended Complaint, ¶ 70. Defendant contends, <u>inter</u> <u>alia</u>, that plaintiffs have inadequately pleaded the misrepresentation

---

first amended complaint alleges that Do "sustained past and future severe and painful injuries, severe mental and emotional distress, fear, anxiety, . . . permanent impairments, loss of enjoyment of life, past and future medical care and expenses, and other losses and damages." First Amended Complaint, at ¶ 56. This allegation, in combination with the underlying factual allegations detailing Do's horrific experience, is sufficient for purposes of Fed. R. Civ. P. 12(b)(6) to constitute an allegation that a lasting physical injury resulted from Do's emotional distress. <u>See</u> <u>Thorpe</u>, 133 N.H. at 304.

theory underlying their unfair or deceptive trade practice claim. I agree.

By basing its CPA claim upon alleged misrepresentations and further asserting that the misrepresentations constituted a knowing and willful violation of the CPA, plaintiffs have in essence accused defendant of fraud. Where an allegation of fraud lies at the core of a cause of action, the heightened pleading standards of Fed. R. Civ. P. 9(b) apply. See Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (applying Rule 9(b) to a claim for conspiracy to defraud); see also FDIC v. Bathgate, 27 F.3d 850, 876 (3d Cir. 1994) (applying Rule 9(b) to a claimed violation of the New Jersey Consumer Fraud Act); Frith v. Guardian Life Ins. Co. of America, 9 F. Supp.2d 734, 742 (S.D. Tex. 1998) (applying Rule 9(b) to a fraud-based claim that defendant violated the Texas CPA). Rule 9(b) requires "specification of the time, place and content of an alleged false representation." Hayduk, 775 F.2d at 444 (citation and internal quotation marks omitted).

The first amended complaint does not detail when defendant made the false representations underlying its CPA claim. Nor does it specify either where the representations were made or the

contents of what defendant said. Accordingly, defendant is entitled to dismissal of Count IV. But the dismissal is without prejudice to plaintiffs' seeking leave to file an amended complaint which complies with the requirements of Fed. R. Civ. P. 9(b).

C.    Motions for Leave to Amend and for Leave to Reply to Defendant's Objection to the Motion for Leave to Amend

Plaintiffs seek leave to amend the first amended complaint so as to add additional factual allegations and to state a claim for negligent misrepresentation, and leave to reply to defendant's objection to this motion. I grant plaintiffs' motion for leave to reply to the objection but deny the motion for leave to amend.

Neither the motion for leave to amend, which was filed more than two months after the Fed. R. Civ. P. 16(b)(1) deadline for amending the pleadings and well after defendant had fully briefed its arguments in support of dismissal of the first amended complaint, nor the reply to defendant's objection makes any effort whatsoever to establish that "good cause" exists for modifying the agreed-upon Rule 16(b) deadline for amending the pleadings. See Hernandez-Loring v. Universidad Metropolitana,

-24-

233 F.3d 49, 51 (1st Cir. 2000) (applying the good cause standard); cf. Riofrio Anda v. Ralston Purina, Co., 959 F.2d 1149, 1154-55 (1st Cir. 1992) (noting that "undue delay" and "undue prejudice to the opposing party" provide bases for denying a motion to amend and observing that allowance of an amendment two months after the deadline established by the Rule 16(b) scheduling order "would have nullified the purpose of rule 16(b)(1)"). Moreover, plaintiffs' motion fails to comply with Local Rule 15(a)'s requirement that parties seeking to amend their pleadings both attach the proposed amended filing and explain why the new allegations and claims were not included in the original filing. I would have to ignore the requirements of the federal and local rules entirely in order to grant plaintiffs' motion.

## III.

For the reasons stated and to the extent described above, I grant in part and deny in part defendant's motion to dismiss the first amended complaint based on the Ski Statute [document no. 11], grant defendant's motion to dismiss Count IV of the first amended complaint [document no. 12], deny plaintiffs' motion for

leave to amend the first amended complaint [document no. 19], and grant plaintiffs' motion for leave to reply to defendant's objection to the motion for leave to amend [document no. 21].

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

May 15, 2002

cc:  Kevin M. Leach, Esq.
     Thomas Quarles, Jr., Esq.
     Peg O'Brien, Esq.